EXXON CORPORATION

v.

GEORGIA ASSOCIATION OF PETROLEUM RETAILERS.

GEORGIA OILMEN'S ASSOCIATION, INC.

v.

George D. BUSBEE et al.

Civ. A. Nos. 78–982 A, 78–1077 A.

United States District Court,
N. D. Georgia,
Atlanta Division.

Dec. 28, 1979.

William Simon, Robert G. Abrams, Stuart H. Harris, Howrey & Simon, Washington, D. C., Bernard J. Caillouet, Elliotte M. Harold, Jr., New Orleans, La., Earle B. May, Jr., Joseph W. Crooks, Jones, Bird & Howell, Atlanta, Ga., for Exxon Corp.

Robert S. Bomar, J. David Dyson, Asst. Atty. Gen., Atlanta, Ga., for Georgia Ass'n of Petroleum Retailers.

Fred G. Stowers, E. Hearst Roane, Jr., and John C. Hollister, Stowers, Roane & Carley, Atlanta, Ga., for Georgia Oilmen's Ass'n, Inc.

J. David Dyson, Asst. Atty. Gen., Atlanta, Ga., for Busbee and Bolton.

Peyton S. Hawes, Jr., Robert S. Jones and Julie Childs, Cofer, Beauchamp & Hawes, Atlanta, Ga., for Petroleum Retailers.

ORDER

RICHARD C. FREEMAN, District Judge.

With the passage of the Gasoline Marketing Practices Act of 1973, Ga.Code §§ 106–1101 et seq., the state of Georgia undertook to regulate relations among actors at all levels of the statewide gasoline distribution network. Intended to protect retailers from what the legislature perceived to be unfair marketing practices by large gasoline companies and gasoline jobbers,[1] the Act governs terms and conditions of franchise agreements and limits certain sales of wholesale and distress gasoline. In this action, one major gasoline supplier—Exxon Corporation—and an organization representing distributors operating in the state— Georgia Oilmen's Association, Inc. [hereinafter GOA]—have sued for a judicial declaration that various portions of the Gasoline Marketing Practices Act are void under the United States Constitution. See 28 U.S.C. §§ 1331, 2201, and 2202. Originally named as defendants were the Governor and Attorney General of Georgia, and the Georgia Association of Petroleum Retailers [hereinafter GAPR], although only GAPR is presently a party. The action now stands before the court on cross-motions for summary judgment, Rule 56, Fed.R.Civ.P.

I. *THE HISTORY OF THE CASE*

Plaintiff Exxon filed Civil Action No. 78–982 on June 2, 1978, naming as defendants Georgia Governor George Busbee and Georgia Attorney General Arthur K. Bolton. GOA filed Civil Action No. 78–1077A on June 26, 1978. GOA named not only defendants Busbee and Bolton, but also GAPR. GAPR sought summary judgment almost immediately, on August 11, 1978. In late September 1978, the plaintiffs moved to consolidate the two actions and filed their own summary judgment motions. Gulf Oil Corporation submitted an amicus curiae brief, in support of plaintiffs' position, on November 27, 1978. By the end of 1978, the substantive issues in the action had been fully briefed by all sides.

Despite the parties' eagerness to obtain speedy adjudication of the dispute, an additional consideration, first raised by the court, necessitated a delay of several months. In an order entered March 6, 1979, we expressed doubt as to the existence of a genuine "case or controversy" between the parties, within the contemplation of Article III of the United States Constitution. We noted that the Act, on its face, conferred no enforcement responsibility on defendants Busbee and Bolton; we expressed concern that the private defendants were merely attempting to continue a legislative battle (which they had fought in representative capacities) in the judicial forum. Fearful

---

1. The Act, by definition, classifies all persons who sell or consign gasoline to dealers as "distributors." Ga.Code § 106–1103(a). Amicus Curiae Gulf Oil Corporation proposes that proper analysis of the gasoline marketing industry requires a tri-partite classification in which distributors are further defined as either suppliers (major oil refiners or suppliers) or jobbers (middlemen who buy from suppliers and sell to retailers). Most of the parties have employed this nomenclature and we adopt it in portions of this order. Of course, all gasoline marketed in Georgia does not necessarily pass through a three-step distribution process.

that "the plaintiffs may have brought a lawsuit in search of a defendant," March 6, 1979 order at 2, we requested that the parties submit briefs directed to the existence of a case or controversy and the propriety of allowing each of the parties to participate in the action.

Exxon, GOA, and GAPR all agreed that the case could be heard and urged that all parties named in the action were properly included. In an order dated June 21, 1979, we concluded that the action could continue, but only as between the private litigants. The members of GAPR and GOA were potential plaintiffs and defendants in a civil suit for damages authorized under the Act and would have had a "sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy." *Sierra Club v. Morton*, 405 U.S. 727, 731, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). As organizations composed of such potential litigants, GOA and GAPR might sue and be sued, consistent with Article III, under the controlling Supreme Court cases. *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 39–40, 96 S.Ct. 1917, 1924–1925, 48 L.Ed.2d 450 (1976); *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

At the same time, we determined that the complete absence of any actual enforcement power—criminal, civil, or administrative—in the hands of the state defendants precluded any possible "case or controversy" between them and the plaintiffs. We allowed Exxon, which had only named Busbee and Bolton as defendants, leave to amend its complaint to add defendant GAPR and dismissed the claims of all plaintiffs against the state defendants.

## II. THE CONTENTIONS OF THE PARTIES

Purged of its Article III impurities, the action may proceed upon an evaluation of the pending summary judgment motions. Exxon's challenges to the Act are

*First*, Sections [1104.1],[2] 1104(h) and 1104(i) of the Georgia Act provide neither ascertainable standards of guilt nor adequate notice of proscribed conduct, thereby denying Exxon due process of law in violation of the Constitutions of the United States and the State of Georgia.[3]

*Second*, Sections [1104.1], 1104(h), and 1104(i), 1104(j), 1104(k) and 1107 of the Georgia Act are expressly preempted by and in conflict with the purposes and objectives underlying the federal Petroleum Marketing Practices Act [15 U.S.C. § 2801 *et seq.* (PMPA)] and are, therefore, invalid under the Supremacy Clause, Article VI, Clause 2, of the United States Constitution.

*Third*, in encouraging or requiring automotive gasoline distributors to engage in conduct proscribed by the federal Sherman Act [15 U.S.C. § 1 *et seq.*] and in frustrating the pro-competitive purposes underlying the Act, Section [1104.1] of the Georgia Act conflicts with superior federal law and is invalid under the Supremacy clause.

Exxon reply memorandum, filed December 12, 1978, at 2. GOA raises these same contentions and also alleges (1) that section 106–1104.1 conflicts with section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a), and (2) that section 106–1104.1 is preempted by the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751 *et seq.* [hereinafter EPAA]. Before proceeding to an evaluation of the plaintiffs' claims, we will briefly review the challenged portions of the Georgia Act.

## III. THE GEORGIA ACT

The Georgia Marketing Practices Act contains two sets of conduct-governing provisions. After several introductory provisions and a definitional section, Ga.Code

---

**2.** Section 4A of the Act, cited in Exxon's brief, has been codified as Ga.Code § 106–1104.1. In this order we will cite to the codified form of the statute.

**3.** Exxon has not invoked the court's diversity or pendant jurisdiction, and has not separately discussed the applicability of the Georgia constitution. We thus consider that the case presents only federal constitutional issues.

§ 106–1103, section 106–1104 sets forth an extensive series of rules regulating gasoline marketing agreements, or franchises, between a supplier and a retailer.[4] These provisions affect the contents of any franchise agreement and the allowable grounds upon which a supplier may terminate an agreement.

4. Section 106–1104 provides:

It shall be a violation of this Chapter for any gasoline distributor who has a marketing agreement with a gasoline dealer, directly or indirectly, through any officer, agent or employee, to commit any of the following acts:

(a) to terminate or cancel such marketing agreement without good cause prior to the expiration date;

(b) to terminate or cancel an existing marketing agreement prior to expiration date or to not enter subsequent agreements without having first given written notice setting forth all the reasons for such action to the gasoline dealer at least 60 days in advance of such termination, cancellation or expiration of the existing agreement; provided, however, that such notice shall not be required of a gasoline distributor acting with reasonable cause to believe said dealer is maliciously and willfully damaging the property rights of said gasoline distributor, who has voluntarily abandoned the marketing relationship, or who after five days notice has failed to pay his just debts when due to said distributor;

(c) by the use of coercion, intimidation or threats, to force or induce such gasoline dealer to deal exclusively in products manufactured, distributed or sponsored by such gasoline distributor or to participate in promotions. Hours of operation, which are set in any written agreement, in effect prior to July 1, 1978, can only be changed by mutual consent. It shall also be the duty of the distributor to advise the dealer in writing prior to execution of the agreement the projected potential gallonage and the dealer shall acknowledge same in writing prior to execution of the marketing agreement that he is willing to accept same;

(d) to engage in any acts which have the purpose, intent or effect of fixing or maintaining prices, or of forcing or inducing adherence to prices at which such gasoline distributor's products are to be resold by such gasoline dealers: Provided, that nothing herein shall be deemed to prohibit recommendation, suggestion, urging or discussion;

(e) to require a gasoline dealer, at the time of entering into a marketing agreement, to assent to a release, assignment, novation, waiver or estoppel which would relieve any person from liability imposed by this Chapter;

(f) to require or prohibit any change in management of any gasoline dealer unless such requirement or prohibition of change shall be for good cause, which cause shall be stated in writing by the gasoline distributor;

(g) to impose standards of performance upon the gasoline dealer other than those in the marketing agreement;

(h) to provide any term or condition in any marketing agreement, or other agreement, ancillary or collateral thereto, which term or condition directly or indirectly violates this Chapter;

(i) after July 1, 1978, to require operation in excess of a six-day week and/or in excess of a 12-hour day if the dealer can prove it results in substantially lessening the profits earned in his entire operation to the extent that it is not economically feasible to continue said operation: Provided, however, that the provisions of this subsection shall in no way impair the obligation of contracts made prior to July 1, 1978: and Provided, further, that the provisions of this subsection shall not impair the writing of a contract for hours in excess of the hours expressed herein or to impair the right to enforce the hours contained in any contract until sufficient evidence is available to a dealer to exercise the rights hereinbefore provided: and Provided, further, that the provisions of this subsection shall not be applicable to dealers or distributors who operate a food or convenience store in conjunction with the retail sale of automotive gasoline and related products;

(j) after July 1, 1978, to refuse to continue to deal with an automotive gasoline dealer with whom it has had a marketing agreement for three years unless:

(1) the dealer fails to comply with conditions of such agreement or fails to act in good faith in carrying out the terms of such agreement, or

(2) such automotive gasoline distributor's principal stockholder or principal operator dies during the term of any marketing agreement, in which case such agreement may be refused renewal by the heirs giving notice as provided for in this Chapter, or

(3) the dealer has violated the laws of this State relative to the ownership or operation of retail businesses;

(k) after July 1, 1978, to refuse to continue to deal with an automotive gasoline dealer with whom it has had a marketing agreement for three years if such automotive gasoline dealer satisfies the court in an action brought by the automotive gasoline dealer under this Section that such refusal to deal is not the product of the good faith business judgment of the automotive gasoline distributor.

Ga.Code § 106–1104.1 imposes restrictions on sales by suppliers and jobbers. It reads:

It shall be an unlawful predatory and unfair business practice for an automotive gasoline distributor who controls a product supply, controls the price of that product and has the power to require the purchase of that product by another automotive gasoline distributor or an automotive gasoline dealer doing business in this State to sell said product at prevailing automotive gasoline distributor prices at any time to another automotive gasoline distributor for resale to automotive gasoline dealers with the purpose or intent that said product will be sold at retail by said automotive gasoline distributor and fails to offer its automotive gasoline dealers an opportunity to purchase an equal volume of product upon the same terms and conditions, excepting expenses for advertising, credit cards and other expenses relative to its automotive gasoline dealers, when said automotive gasoline distributor is selling said product at distress prices to other automotive dealers in the dealer's marketing area.

The section is obviously somewhat ambiguous, and is consequently the target of a vigorous "void for vagueness" challenge by the plaintiffs.

Section 106–1105 gives practical effect to the standards mandated in the previous provisions by creating a cause of action for money damages by a gasoline dealer believing he has been injured in violation of the Act. The dealer may also seek declaratory or injunctive relief. Section 106–1106 states that the Act shall be applied prospectively, and section 106–1107 sets out defenses available to a distributor.

Section 106–1108 imposes certain procedural obligations upon a dealer whose franchise has been terminated but who claims a right to continue doing business under the Act. Sections 106–1109 and 106–1110 govern the applicability of the Act to franchise agreements and real property rights, respectively. Section 106–1111 allows a franchisor to sue for breach of a franchise or rental agreement. Finally, section 106–1112 imposes a two-year statute of limitations upon actions brought under sections 106–1105 and 106–1111.

## IV. *VAGUENESS*

Plaintiffs' void-for-vagueness challenge contains two related arguments. First, they argue that words of the Georgia law are undefined, unfamiliar, or otherwise so vague that the Act "not only fails to provide adequate notice of the meaning and scope of proscribed conduct, but . . . also fails to set forth an ascertainable standard of guilt." Plaintiffs continue, "This fatal indefiniteness violates the due process principle of fundamental fairness." Memorandum in support of Exxon's motion for summary judgment, filed September 22, 1978, at 6.[5] Plaintiffs attack the terms "distress prices," "controls product supply," "controls the price of that product," and "has the power to require the purchase of that product" in section 106–1104.1; "indirectly violates" in section 106–1104(h); and "economically feasible" and "food or convenience store" in section 106–1104(i).

In addition, the plaintiffs claim that section 1104.1 is incomprehensible. Apart from its many undefined and ambiguous terms, they argue, the provision is grammatically—and therefore logically—deficient, so that it is impossible to discern even the barest outlines of the conduct the legislature intended to proscribe.

■ Void for vagueness analysis begins with recognition that the doctrine has been carefully limited to discrete areas of the law. Statutes affecting first amendment free speech rights and statutes proscribing criminal penalties have consistently faced a

---

5. As we will explain, proper analysis of a void for vagueness attack requires an early inquiry into whether the proscriptions of the challenged statute are civil or criminal. Although Exxon fails to discuss explicitly this fundamental distinction, the fact that its description is couched in criminal terms betrays an awareness that the criminal statute is more easily susceptible to a void for vagueness challenge. The Georgia Act, of course, carries no criminal penalties.

considerably higher level of scrutiny than ordinary civil laws. *See Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *Ashton v. Kentucky*, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966); *Buckley v. Valeo*, 171 U.S.App.D.C. 172, 225–226, 519 F.2d 821, 874–75 (D.C.Cir.1975), *aff'd in part* and *rev'd in part*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Hunter v. Allen*, 422 F.2d 1158 (5th Cir. 1970), *rev'd*, 401 U.S. 989, 91 S.Ct. 1237, 28 L.Ed.2d 528 (1971); *Massachusetts Welfare Rights Organization v. Ott*, 421 F.2d 525 (1st Cir. 1969). The reasons behind this discrepancy are apparent. Courts are naturally fearful that an overly conservative citizen seeking to comply with an uncertain law will forego exercise of free speech rights. And the cases identify loss of liberty as a particularly severe penalty to one who is unsure how to pattern his conduct.[6]

Outside of the first amendment and criminal spheres, the void for vagueness doctrine has had little application. To be sure, there have been cases which, in dictum, have suggested its continued "relevance" to all civil statutes. *Boutilier v. Immigration and Naturalization Service*, 363 F.2d 488, 495 (2d Cir. 1966), *aff'd*, 387 U.S. 118, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967). *See Zwickler v. Koota*, 389 U.S. 241, 249, 88 S.Ct. 391, 396, 19 L.Ed.2d 444 (1967); *Ashton v. Kentucky*, 384 U.S. 195, 200, 86 S.Ct. 1407, 1410, 16 L.Ed.2d 469 (1966). But the cases routinely approve the challenged statutes, and the Fifth Circuit has recently hinted that the void for vagueness doctrine may have little or no application outside of the first amendment or criminal contexts.

As thus construed, we conclude that the reporting requirements do not infringe on any of Appellees' constitutional rights. Their free-speech, first amendment challenge is foreclosed by *United States v. Harriss*, 1954, 347 U.S. 612, 74

S.Ct. 808, 98 L.Ed. 989. In view of the fact that this is not a criminal prosecution for wilful failure to report and that Appellees' conduct clearly was that of a persuader, their contention that the reporting provisions are void for vagueness is equally meritless.
*Wirtz v. Fowler*, 372 F.2d 315, 334–35 (5th Cir. 1966).

The consensus among courts today is that an ordinary civil statute is void for vagueness only where it exacts obedience to a rule that is "so vague and indefinite as really to be no rule or standard at all." *A. B. Small Co. v. American Sugar Refining Co.*, 267 U.S. 233, 239, 45 S.Ct. 295, 297, 69 L.Ed. 589 (1925). In *American Sugar Refining* the Court reaffirmed earlier decisions that a federal law proscribing "any unjust or unreasonable * * * charge in * * * dealing in or with any necessaries," was unconstitutionally vague. The standard, however, has rarely been applied. Courts have approved laws, for instance, that operate in narrow regulatory fields. *Brennan v. Occupational Safety and Health Review Commission*, 505 F.2d 869 (10th Cir. 1974), vindicated an O.S.H.A. regulation requiring that a person adequately trained in first aid be available at a workplace where there was no medical facility in "near proximity." 29 C.F.R. § 1910.151(b). The court, after distinguishing cases decided in the criminal or first amendment areas, wrote:

We are considering a regulation promulgated pursuant to remedial civil legislation, *Ryder Truck Lines, Inc. v. Brennan*, 5 Cir., 497 F.2d 230, 233, and must do so "in the light of the conduct to which it is applied." *United States v. National Dairy Corp.*, 372 U.S. 29, 36, 83 S.Ct. 594, 600, 9 L.Ed.2d 561. The question is whether the regulation "delineates its reach in words of common understanding." *Cameron v. Johnson*, 390 U.S. 611, 616, 88 S.Ct. 1335, 1338, 20 L.Ed.2d

---

**6.** Courts have also scrutinized with extreme caution laws involving sanctions deemed as serious as criminal penalties. *See, e. g., Alsager v. District Court of Polk County, Iowa (Juvenile Division)*, 406 F.Supp. 10 (D. Iowa 1975), *adopted* 545 F.2d 1137 (8th Cir. 1976) (termina-tion of parental rights). *See also Paccar v. National Highway Traffic Safety Administration*, 573 F.2d 632 (9th Cir. 1978) (dictum) (statutes "prescribing penalties" must be drafted without ambiguity).

182. A permissible "leeway" is allowed in the field of regulatory statutes governing business activities in narrow categories. *Papachristou [v. City of Jacksonville,]* 405 U.S. [156,] at 162, 92 S.Ct. 839 [, 31 L.Ed.2d 110.]

505 F.2d at 872.

As the *Brennan* decision recognizes, absolute precision is often impossible in drafting workable laws. Where the draftsman is imprecise, his words may be given meaning by the context in which they apply. *Clark v. Weeks*, 414 F.Supp. 703, 707 n.3 (N.D.Ill. 1976). Statutes such as the Sherman Act have effected massive delegations of authority to the judiciary to narrow, define, and prescribe rules of conduct emanating from the most general sources. Judicial gloss will often cure vagueness problems, and the routine existence of differences in interpretation of a law does not void the law. *See United States v. Wise*, 550 F.2d 1180, 1187 (9th Cir. 1977); *Clark v. Weeks*, 414 F.Supp. at 707 & n.3; *Maley v. National Acceptance Co.*, 250 F.Supp. 841, 845 (N.D. Ga.1965). *But see Horn v. Burns & Roe*, 536 F.2d 251, 254 n.7 (8th Cir. 1976) (federal courts may not provide limiting interpretation of state statutes).

The very business of courts is interpretation of statutes. Were the mere existence of uncertainty as to a law's construction or application to mean the law was fatally vague, there would be very few laws left on the books. Where an ordinary civil statute can reasonably be interpreted and limited by judicial construction, it will withstand a vagueness challenge.

■ With this standard in mind, we have little difficulty approving the admittedly imprecise language of the Georgia Act. A gasoline distributor is well apprised of the contours of the prohibited activity. Most of the challenged words are employed in everyday commercial discourse and ambiguities may be readily resolved by the Georgia courts. The law is surely not a model of clarity, but it does better than to impose "no rule or standard at all." *American Sugar Refining*, 267 U.S. at 239, 45 S.Ct. at 297. Given the extreme tolerance with which the court must scrutinize the Act in a vagueness challenge, we are unable to sustain plaintiff's attack on the imprecision of the language employed.

■ Section 106–1104.1 presents an additional difficulty. In one extraordinarily lengthy sentence, the section states:

It shall be an unlawful predatory and unfair business practice for an automotive gasoline distributor who controls a product supply, controls the price of that product and has the power to require the purchase of that product by another automotive gasoline distributor or an automotive gasoline dealer doing business in this State to sell said product at prevailing automotive gasoline distributor prices at any time to another automotive gasoline distributor for resale to automotive gasoline dealers with the purpose or intent that said product will be sold at retail by said automotive gasoline distributor and fails to offer its automotive gasoline dealers an opportunity to purchase an equal volume of product upon the same terms and conditions, excepting expenses for advertising, credit cards and other expenses relative to its automotive gasoline dealers, when said automotive gasoline distributor is selling said product at distress prices to other automotive gasoline dealers in the dealer's marketing area.

A casual reading of the section gives the impression that a clear meaning may be gleaned upon more careful examination. A careful reading, however, discloses that the section is grammatically deficient. Midway through the sentence, its author abandoned the infinitive form of the verbs that describe proscribed activity and adopted the third person singular of the present tense: "and fails to offer its automotive gasoline dealers : . .." As a consequence the reader has difficulty discerning whether the section proscribes two sets of activities, those before and those after the central conjunction "and," or whether the section imposes a single prohibition, conditioned by all of the given clauses.

**1016**

The difficulty in understanding section 106–1104.1 is illustrated by the fact that the parties have assumed it to have entirely different meanings. Exxon writes:

> Section [106–1104.1] appears to require an automotive gasoline distributor such as Exxon, which sells gasoline both to other distributors (wholesalers) and to dealers (retailers), to sell gasoline to dealers at the same price offered to any distributor which sells to other dealers at "distress" prices within the same marketing area.

Exxon brief filed September 22, 1978, at 6. Amicus Gulf Oil Corporation writes:

> Section 1104.1 of the Act provides that when a supplier "controls product supply", "controls price", has "power to require purchase" and is selling product at "distress prices", it is an unlawful predatory and unfair business practice for such supplier to sell to a jobber for resale to dealers "with the purpose or intent that said product will be sold at retail by [the jobber]" unless the supplier offers its dealers ". . . an opportunity to purchase an equal volume of product upon the same terms and conditions."

Brief of Amicus Gulf Oil Corporation, filed November 22, 1978, at 3. Plaintiff GOA contends

> Section 1104.1 appears to provide that a distributor commits an unlawful business practice when he sells gasoline to a dealer at a distress price and fails to offer his automotive gasoline dealers an opportunity to purchase an equal volume of product upon the same terms and conditions, excepting expenses for advertising, credit cards and "other expenses relative to its automotive gasoline dealers."

Brief of plaintiff GOA in reply to defendant's motion for summary judgment, filed September 25, 1978, at 10.

By contrast, defendant GAPR considers that section 106–1104.1 contains two separate prohibitions. GAPR argues that the provision:

> (1) Prohibits distributors (oil company or local jobber) from selling gasoline to another distributor (oil company or local jobber) at wholesale prices with the purpose or intent that the gasoline will be sold at retail by that distributor in employee operated stations.
>
> (2) Prohibits automotive distributors (oil company or jobber) from selling gasoline at distress prices to non-captive buyers unless they grant its captive buyers the same opportunity to purchase that gasoline upon the same terms and conditions, excepting expenses for advertising credit cards and other expenses relative to its captive dealers.

Brief of defendant GAPR in support of its motion for summary judgment, filed November 1, 1978, at 6.

The court is not called upon to apply the statute here, only to determine its constitutionality. We have no need, and thus decline, to decide definitively which of the conflicting interpretations is correct. Nevertheless, the differing views as to its basic operation raise vagueness questions that must be resolved. Were the section so garbled that it was impossible to divine, in even the most general terms, which acts it sought to proscribe, then the court would be sorely tempted to hold it unconstitutionally vague. GAPR has, however, made a persuasive showing that its reading of the section is correct. GAPR's interpretation not only seems more logical, but is supported by the Georgia Act's legislative history: in an earlier form of the bill, the two halves of section 106–1104.1 were divided into separate subsections.

We suggest this interpretation of section 106–1104.1 only to demonstrate that the provision is capable of comprehension. The plaintiffs are sufficiently apprised of proscribed conduct so as not to be deprived of due process of law by its application. We therefore reject this second side of plaintiffs' void for vagueness theory, and turn to the contention that various sections of the Georgia Act are preempted by the federal Petroleum Marketing Practices Act.

## V. PREEMPTION BY THE PETROLEUM MARKETING PRACTICES ACT

■ Where Congress has legislated in an area properly delegated to it, the suprema-

cy clause of article VI of the United States Constitution preempts conflicting state law. The preemption doctrine may apply: (1) where there is direct conflict between state and federal regulation; (2) where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941) (invalidating state alien regulation law); or (3) where Congress has "occupied the field" in a given area so as to oust all state regulation, whether friendly or hostile. *See, e. g., Campbell v. Hussey*, 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961) (preemption of tobacco pricing).

The plaintiffs raise the first two theories of preemption, asking that the court declare invalid:

Section 1104(i), which condemns a provision in marketing agreements requiring certain hours of operation, notwithstanding a good faith determination that such provision is of material significance to the franchise relationship; Sections 1104(j) and 1104(k), which proscribe grounds for termination and nonrenewal; Section 1107, which limits a gasoline distributor's defenses in an action brought under the Georgia Act; and Section 1104(h), which condemns any "term or condition" which is contained in any marketing agreement and which "directly or indirectly" violates the Georgia Act.

Exxon brief filed September 22, 1978, at 11. Plaintiffs allege that it is impossible for gasoline distributors to comply with both federal and state law, and that the Georgia Act prescribes different standards than the federal statute, creating a conflict in purpose and objectives.

Subchapter I of the PMPA, 26 U.S.C. §§ 2801–2806, sets forth comprehensive terms regulating the termination and nonrenewal of franchise agreements. It is conceded to affect "marketing agreements" between automotive gasoline dealers and distributors, as covered by the Georgia Act. The relevant preemptive provision is found at 15 U.S.C. § 2806(a):

To the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing of notification with respect thereto) of any such franchise or to the nonrenewal (or the furnishing of notification with respect thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter.

■ Where preemption is deemed to occur by virtue of conflict with a federal statute, the extent of preemption is largely a question of statutory construction. *See* L. Tribe, *American Constitutional Law* 377 (1978). In determining the preemptive scope of the PMPA, our task is greatly simplified by the expression of legislative intent found in section 2806. By specifying with such precision when the states must stand aside in favor of federal regulation, Congress implicitly marked out the bounds of the power it intended to exercise. Beyond those limits, state regulation may claim full federal approbation.

Congress has determined that the realm of termination or non-renewal of franchises shall be ruled exclusively by the federal sovereign. The court's duty is to detect acts of state trespass. It is agreed that the Georgia Act's provisions are not "the same as" those of the PMPA. Where there is impermissible encroachment, the offending portions of the Georgia law must fall.

■ The defendants concede, and the court agrees, that Ga.Code §§ 106–1104(i) and 106–1104(k) violate federally preempted territory. With certain exceptions, each makes it a violation of Georgia law for a distributor "to refuse to continue to deal with an automotive gasoline dealer with

whom it has had a marketing agreement for three years . . . ." These sections purport to regulate in precisely the domain carved out for federal exclusivity. We hold that they are preempted by the PMPA and must be declared invalid under the supremacy clause. It follows that section 106–1107, which prescribes defenses in a lawsuit charging unlawful termination of a franchise, is also invalid.

Ga.Code § 106–1104(i) forbids distributors from requiring a dealer to operate for more than six days per week or more than 12 hours per day. The plaintiffs contend that the section is inconsistent with the PMPA, because the federal act allows more flexibility to the distributor wishing to terminate a franchise. Plaintiffs apparently envision a suit by a dealer claiming his franchise was terminated because of his refusal to accede to the distributor's demand for a work week longer than authorized by section 106–1104(i).

We think plaintiffs overstate the probable application of the section. It deals with the substantive terms of an existing contract, apparently conferring a cause of action upon a dealer anytime a franchise agreement provides for conditions that violate its limitations. Its practical effect is to forbid enforcement of what are deemed oppressive terms of a franchise agreement and, with the aid of section 106–1105, perhaps to confer a cause of action upon a dealer who has suffered by complying with the offending terms. The import of the section extends far beyond the narrow hypothetical situation feared by the plaintiffs. While we agree that existence of the PMPA forbids a suit by a Georgia dealer claiming he was terminated because he refused to agree to terms forbidden by the Georgia Act, this slight, unlikely possibility does not authorize us to strike down the law. Congress carefully tailored the preemptive effect of the PMPA, and we would betray its purpose by reaching unnecessarily to find conflict with state law.

Section 106–1104(h) withstands the plaintiffs' attack for similar reasons. That section renders it unlawful

to provide any term or condition in any marketing agreement, or other agreement, ancillary or collateral thereto, which term or condition directly or indirectly violates this Chapter; . . . .

The provision aims directly at the terms of a franchise agreement, and could have at best some fortuitous and attenuated application to a lawsuit over termination or nonrenewal of a franchise relationship. Again, the court will not go to unnecessary and unprincipled lengths to find state-federal conflict.

## VI. PREEMPTION BY THE SHERMAN ACT

The plaintiffs direct their Sherman Act challenge to Ga.Code § 106–1104.1. It will be recalled that section 106–1104.1 includes a proscription against a producer's selling gasoline to a wholesaler at the prices charged to wholesalers if the producer has the "purpose or intent" that the wholesaler will resell the gasoline at retail. The plaintiffs argue that the Georgia law requires producers and wholesalers to confer and agree upon the destination of gasoline before reaching a price or before the producer may agree to sell. They charge that such an arrangement constitutes a vertical customer restriction, imposed by the producer in violation of the Sherman and Clayton Acts. The Acts impose penalties of up to three years imprisonment and, for a corporation, up to one million dollars in fines upon the principals to any contract, combination, or conspiracy in restraint of trade, and subject violators to treble damages actions by private plaintiffs. *See* 15 U.S.C. §§ 1, 15.

■ The state-federal conflict proposed by the plaintiffs may take two forms. First, the Georgia legislature may have attempted to coerce behavior that violates the antitrust laws. If this is the case, the state law obviously may not stand. *McDermott v. Wisconsin*, 228 U.S. 115, 132, 33 S.Ct. 431, 435, 57 L.Ed. 754 (1913). *See Free v. Bland*, 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962). Second, the Georgia Act may violate the federal policy favoring competition

even though no person complying with it violates the antitrust laws. *See Schwegmann Brothers v. Calvert Distillers Corp.*, 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035 (1951). In either case, "federal preemption seems clear where the state, without supervising the private power it creates,[7] attempts to authorize private parties to escape the structures of the antitrust laws, to compel them to act in a manner forbidden by the antitrust laws, or to prevent them from competing in a manner clearly mandated by federal law." I. P. Areeda & D. Turner, *Antitrust Law* 64 (1978).

■ We turn to the conduct mandated by the Georgia Act to determine whether it does in fact violate either the letter or the spirit of the Sherman Act. The plaintiffs characterize it as a vertical customer restraint in which the gasoline supplier limits the class of persons to whom a jobber may resell to retailers. Since the Supreme Court decision in *Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), non-price vertical restraints have been judged under the "rule of reason" standard. "Under this rule, the fact-finder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Id.*, 433 U.S. at 49, 97 S.Ct. at 2557. The *Sylvania* case involved location clauses in franchise agreements, a moderate form of territorial restriction. The decision, overruling *United States v. Arnold Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), expressed sympathy toward restraints that adversely affected only intra-brand competition. The court emphasized that certain vertical restrictions might have redeeming qualities, including the potential for producing significant business efficiencies. 97 S.Ct. at 2560–61.

The *Sylvania* case renders our course much less certain than it otherwise might have been. The conduct compelled by the Georgia Act is no longer *per se*, or irrebuttably, illegal. It is merely theoretically illegal. The plaintiffs have not cited, and our research has not disclosed, a single case where a state law has been invalidated because it compels activity that might be federally proscribed upon application of rule of reason analysis. Indeed, our research fails to disclose any decision even contemplating the application of the preemption doctrine to a rule of reason practice.

We stated earlier that there are potentially two forms of the preemption doctrine at work. *Schwegmann* invalidates state law compelling anticompetitive conduct, regardless of whether the state law actually forces anyone to commit an antitrust violation. The most serious anticompetitive effect that might be produced by application of section 106–1104.1 is the elimination of jobbers as competitors in the retail market. In *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 98 S.Ct. 2207, 2217–18, 57 L.Ed.2d 91 (1978), the Court did not even blink at the likelihood that *Schwegmann* preemption under the Sherman Act might bar the state from forbidding all petroleum producers and refiners from operating retail outlets. Like Maryland's law, the Georgia Act does not so contravene the spirit or goals of the Sherman Act that it must fall under the Supremacy Clause.

As in *Exxon*, there is a second strain of possible preemption: the spectre of physically incompatible demands by state and federal law. The plaintiffs contend that section 106–1104.1 not merely contravenes the procompetitive spirit of the Sherman Act but will actually compel gasoline distributors to violate the Act. Where it may be physically impossible to meet the demands of both state and federal sovereigns, the importance of even a slight inconsistency in policy grows larger.

The court entertains serious doubts as to whether the practices that will be compelled by section 106–1104.1 are, after *Sylvania*,

---

7. The record does not suggest, and defendants do not contend, that Georgia has erected a "cohesive regulatory program" that might immunize coerced anticompetitive conduct under the state action doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 89 L.Ed. 315 (1942). *See* L. Sullivan, *Handbook of the Law of Antitrust* 735 (1977).

illegal. Despite the defendants' having filed a summary judgment motion, the plaintiffs have proffered very little evidence showing or even suggesting an actual anticompetitive impact. The Georgia law will create no territorial monopolies and will, at most, eliminate only a small portion of the competitors in local retail markets.[8] The significance of price competition may be somewhat lessened by the existence of limited federal price controls. And unlike vertical price maintenance, the coerced practice has not been claimed to facilitate supplier cartels. See Pitofsky, *The Sylvania Case: Antitrust Analysis of Non-Price Vertical Restrictions*, 78 Col.L.Rev. 1, 15–16 (1978).

The court must conclude that the likelihood of head-on conflict between state and federal law remains far too hypothetical to justify judicial intervention. The cases counsel restraint in seeking out such conflict, even where the acts compelled by state law are claimed to constitute *per se* antitrust violations:

> Appellants' first argument is that compliance with the Maryland statute may cause them to violate the Robinson-Patman Act. They stress the possibility that the requirement that a price reduction be made on a statewide basis may result in discrimination between customers who would otherwise receive the same price, and they describe various hypothetical situations to illustrate this point. But, "[i]n this as in other areas of coincident federal and state regulation, the 'teaching of this Court's decisions . . . enjoin[s] seeking out conflicts between state and federal regulation where none clearly exists.' *Huron Cement Co. v. Detroit*, 362 U.S. 440, 446, 80 S.Ct. 813, 817, 4 L.Ed.2d 852." *Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35, 45, 86 S.Ct. 1254, 1261, 16 L.Ed.2d 336. See also *State of Wisconsin v. Texaco, Inc.*, 14 Wis.2d 625, 111 N.W.2d 918 (1961). The Court in *Seagram & Sons* went on to say that [a]lthough it is possible to envision circumstances under which price discriminations proscribed by the Robinson-Patman

Act might be compelled by [the state statute], the existence of such potential conflicts is entirely too speculative in the present posture of this case" to warrant pre-emption. 384 U.S., at 46, 86 S.Ct., at 1261.

*Exxon*, 98 S.Ct. at 2216 (footnote omitted). Plaintiffs must show a genuine anticompetitive effect, a genuine likelihood of antitrust liability, and a genuine need for invoking the Supremacy Clause. The entirely hypothetical applicability of *Sylvania* is insufficient grounds for striking down the state law. We resist unnecessary and unjustified speculation, and hold that there presently exists no conflict with the Sherman Act sufficient to invalidate the Georgia statute.

## VII. REMAINING CONTENTIONS

Plaintiffs also charge that the Georgia Act (1) conflicts with the Robinson-Patman Act; (2) purports to legislate in an interstate area reserved exclusively for Congress; and (3) conflicts with the Federal Energy Petroleum Allocation Act of 1975, 15 U.S.C. § 751 *et seq.* (FEPAA). These points are more readily answered; we find none convincing.

The first two arguments were raised, on similar facts, in the recent *Exxon* decision. Maryland, besides requiring distributors to divest themselves of retail outlets, mandated that "voluntary allowances" be extended uniformly to all retail service stations in the state. Exxon claimed that the requirement upset the delicate Robinson-Patman formulation of when price discrimination is permissible: it reasoned that the state law denied refiners the benefit of the good-faith defense found in section 2(b).

The proviso in § 2(b) of the Robinson-Patman Act is merely an exception to that statute's broad prohibition against discriminatory pricing. It created no new federal right; quite the contrary, it defined a specific, limited defense, and even narrowed the good-faith defense that had previously existed. To be sure, the defense is an important one, and the

---

8. We recognize, however, that wholesalers who can obtain gasoline more cheaply than retailers may be particularly effective competitors in the retail market.

interpretation of its contours has been informed by the underlying national policy favoring competition which it reflects. But it is illogical to infer that by excluding certain competitive behavior from the general ban against discriminatory pricing, Congress intended to pre-empt the States' power to prohibit any conduct within that exclusion.

98 S.Ct. at 2217 (footnotes omitted).

Plaintiffs next argue that retail and wholesale marketing of automotive gasoline is so exclusively federal in nature or so dependent on national uniformity that any state regulation is pre-empted under the supremacy clause. This challenge, when made to the Maryland law, was quickly discounted by the Supreme Court. The Court's logic is equally applicable here:

> To be sure, "the Commerce Clause acts as a limitation upon state power even without congressional implementation." *Hunt v. Washington Apple Advertising*, supra, 432 U.S. [333,] at 350, 97 S.Ct. [2434,] at 2445 [, 53 L.Ed.2d 383] (citations omitted): But this Court has only rarely held that the Commerce Clause itself preempts an entire field from state regulation, and then only when a lack of national uniformity would impede the flow of interstate goods. See *Wabash, St. Louis & Pacific R. Co. v. Illinois*, 118 U.S. 557, 7 S.Ct. 4, 30 L.Ed. 244; see also *Cooley v. Board of Wardens*, 12 How. 299, 319, 13 L.Ed. 996. The evil that appellants perceive in this case is not that the several States will enact differing regulations, but rather that they will all conclude that divestiture provisions are warranted. The problem thus is not one of national uniformity. In the absence of a relevant congressional declaration of policy, or a showing of a specific discrimination against, or burdening of, interstate commerce, we cannot conclude that the States are without power to regulate in this area.

98 S.Ct. at 2215.

Finally, we reject plaintiffs' contention that section 106–1104.1 conflicts with the FEPAA by disrupting the assigned price or supply allocations between wholesalers and retailers. Our reading of the section discloses no effect on allocations at different levels. A supplier must offer all retailers an equal share of distress gasoline. A supplier is not, however, required to provide every retailer with wholesale gasoline whenever a wholesaler sells at retail. Plaintiffs' final challenge rests on the premise that section 106–1104.1 contains a single prohibition. Having distilled the section into two separate proscriptions, we reject this challenge.

## VIII. CONCLUSION

The Georgia Act has withstood the majority of plaintiffs' challenges. We conclude and hereby declare that sections 106–1104(j), 106–1104(k), and 106–1107 are invalid as preempted by the federal Petroleum Marketing Practices Act. The remainder of the Georgia law stands intact.

Accordingly, the cross-motions of all parties for summary judgment are GRANTED IN PART and DENIED IN PART, as set forth in the terms of this order. The Clerk of the Court shall enter final judgment in this action.