**L.C. WILLIAMS OIL CO.,
INC., Plaintiff,**

v.

**EXXON CORP., Defendant.**

**No. C–84–622–D.**

United States District Court,
M.D. North Carolina,
Durham Division.

April 19, 1985.

Noel L. Allen, Raleigh, N.C., and Edward S. Holmes, Pittsboro, N.C., for plaintiff.

John T. Allred and Julia V. Jones, Charlotte, N.C., and Robert L. Norris and Rene J. Mouledoux, Houston, Tex., for defendant.

## MEMORANDUM OPINION

GORDON, Senior District Judge.

This matter is before the Court on a motion by the defendant Exxon Corp. (Exxon) for partial summary judgment as to the plaintiff L.C. Williams Co.'s (Williams) wrongful franchise termination claim under the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, *et seq.* (PMPA).

For the reasons set forth below, the Court will grant Exxon's motion for partial summary judgment and thereby render moot Williams' prayer for a preliminary injunction. The Court also concludes that, contrary to the defendant's assertion, the PMPA does not preempt the plaintiff's North Carolina unfair trade practices claims. These state claims will be retained under this Court's diversity jurisdiction for later adjudication.

## FACTS

Construing the facts "in the light most favorable to the party opposing the motion," *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979) quoting *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), the Court finds first that the plaintiff L.C. Williams Oil Co. is a North Carolina corporation based in Pittsboro, North Carolina which distributes petroleum products to numerous retail outlets in central and eastern North Carolina. Defendant Exxon Corp. is a New Jersey corporation with its principal place of business in New York which supplies petroleum fuel and other products in North Carolina. Williams and Exxon, on May 13, 1981 and February 4, 1984, entered into "Distributor Agreements" under which Exxon was to provide specified amounts of its brand of automobile fuel to Williams which then distributed the fuel to retailers. The 1984 agreement replaced the earlier one. Before the execution of at least the first agreement, Exxon's representative explained and provided copies of Exxon's "deidentification guidelines" to the plaintiff's president, Mr. L.C. Williams, Jr. (Mr. Williams) (Deft.'s pretrial Exhibit B—W.F. Gaskins affidavit). These guidelines were to be followed in the event that Williams started selling any brand in addition to Exxon in the Exxon branded retail stations.

Sometime in 1982, while preparing to expand its distribution network, Williams received a verbal agreement from John A. Hagerty (Hagerty), Exxon's Raleigh, North Carolina District Manager, that "Exxon

would provide [Williams] as much Exxon gasoline as was necessary to accomodate the proposed expansion." (L.C. Williams, Jr. affidavit, p. 1). From 1981 through 1984 Williams did actively pursue and establish numerous new accounts and ultimately increased its retail outlets from 12 in 1981 to 50 in 1984. In turn, Exxon provided Williams with steadily increasing amounts of gasoline and, from 1981 through 1984, allowed Williams to purchase quantities in excess of its contractually allocated allotments.[1]

The "Product Schedules" which were incorporated by reference into and referred to numerous times in the Distributor Agreements specified that the "source" of Williams' annual quantity would be Exxon's Greensboro terminal. Indeed, despite several verbal and written requests by Williams to allow it to utilize Exxon's Selma, North Carolina distribution terminal so as to more economically service its growing retailer network, Exxon consistently refused Williams' requests and cited supply problems at Selma as its rationale.

On May 11, 1983, after Hagerty again refused to allow Williams to use the Selma terminal, Williams notified Exxon by letter that it regretfully would have to start purchasing and distributing another brand of gasoline in addition to Exxon. This practice is known in the industry as "double branding" and is lawful so long as the appropriate brand names and trademarks are displayed for each gasoline dispenser.

Exxon responded to Williams' letter by again citing its "limitation in supplying current and future demands in eastern North Carolina from our Selma terminal." (Ptf's

pre-trial Exhibit 7—5/20/83 letter from W.R. Carter (Carter), retail sales manager for Exxon's Southern Region, to Mr. Williams).

Following next in chronological order—though not necessarily causally linked to Williams' double branding decision [2]—is Carter's 9/1/83 intra-office memo to W.N. Menefee (Menefee), another Exxon manager. This memo read, in pertinent part:

In the recent reorganization, I believe you picked up L.C. Williams Oil Co. in Pittsboro, N.C.

The attached memo will be of interest as background... Based on his interest in developing stores in Raleigh and Greensboro markets, we need to look closely at designating Williams as a 'no-growth' distributor.

Attached to this intra-office memo were Williams' 5/11/83 letter and Carter's 5/20/83 reply letter. In handwriting on the intra-office memo, Menefee noted:

... let's take action necessary to designate Williams as 'no-growth' if that is appropriate.

The term "no-growth" apparently originates in Exxon's "Distributor Business Strategies" under which it serves major metropolitan or "A–1" markets by encourag[ing] growth through direct served dealer operations [while] minimiz[ing] existing A–1 market [branded] distributor growth. (Ptf's pre-trial Exhibit 8, p. 220, 227). Williams, as a wholesale distributor of Exxon products, constituted a "branded distributor" which Exxon utilized to serve the less densely populated "C" markets.[3]

---

1. The actual gas volumes purchased by Williams were: (rounded to the nearest hundred gallons)

| Contract Year | Volume in Gallons |
|---|---|
| 1980–1981 | 2,499,300 |
| 1981–1982 | 3,466,200 |
| 1982–1983 | 4,292,300 |
| 1983–1984 | 4,728,000 |

The actual amounts purchased in excess of the contract's annual quantity were:

| | |
|---|---|
| 1981–1982 | 967,200 |
| 1982–1983 | 1,793,000 |
| 1983–1984 | 2,229,000 |

2. The determination of this causal relationship is not necessary to the disposition of the motion at issue and can be more appropriately explored and decided in a subsequent adjudication.

3. Exxon, as might be expected, challenges vehemently Williams' perjorative use of "no-growth" and supports its position by emphasizing that, contrary to the "Distributor Business Strategies" ("minimize existing A–1 market distributor growth ... by maintaining such distributor's contracts at current contract volumes"), Exxon annually increased Williams' actual allocations.

As the plaintiff admits, "on November 11, 1983, based upon a report from a competitor of plaintiff, Exxon initiated an investigation and subsequently determined that plaintiff had obtained petroleum from a non-Exxon source and deposited it at an Exxon-branded" retailer. (Ptf's brief p. 5). This "investigation" consisted of taking samples of gas from the suspect retailer's tanks. The sample analysis revealed both Exxon and non-Exxon petroleum in the fuel.

Following the investigation, on February 29, 1984, several Exxon representatives met with Mr. Williams to discuss their discovery. Mr. Williams admitted at that time that he had purchased non-Exxon gasoline and knowingly provided it to his retail outlets to be sold under the Exxon name. (Mr. Williams' deposition at p. 95 & 170, Bailey & Gaskins' affidavits). Mr. Williams admitted to not notifying his retailers nor the public that non-Exxon gasoline was being sold until soon after this February 29, 1984 meeting. Even after this meeting, Williams performed the proper deidentification of retail stations at only two of its forty-one total outlets and also has admitted that some dealers were not ever informed that Williams had sold them non-Exxon products. (Mr. Williams' deposition at pp. 171 & 120). In fact, even after the franchise termination notice, plaintiff admits to having furnished non-Exxon fuel to stations branded as Exxon outlets. (Mr. Williams deposition at pp. 85, 94, 95 & 132).

At Williams' request, Exxon extended the termination date until July 1, 1984 to allow Williams to appeal the decision through Exxon's Headquarters Distributor Relations Committee in Houston, Texas.

Williams exhausted Exxon's appellate options before this date and, on June 29, 1984, filed this action in the Chatham County Superior Court, from which it was removed to this Court.

## CONTENTIONS OF THE PARTIES

Plaintiff Williams, while admitting that it did "distribute non-Exxon gasoline to Exxon branded distributors," explains that this was an "unwillful mistake" and one made with "no intention to mislead, defraud, or otherwise violate the law or its distributorship agreement with Exxon." (Ptf's Brief p. 30). Instead, Williams contends that Exxon's numerous "unlawful actions, [including] breach of fiduciary duty, secret territorial schemes, retaliatory classifications designed to destroy or diminish a lawful business, civil entrapment and arbitrary and discriminatory termination" forced Williams to commit the misbranding mistake and should serve to defeat the partial summary judgment motion. (Ptf's Brief p. 31).

Conversely, Exxon argues in support of its motion that "plaintiff's misbranding ... constituted several clear and distinct grounds for termination under the PMPA" (Deft's Brief p. 30) and that the myriad allegations by Williams are merely "feeble attempts to fan the flames and create issues of fact." (Deft's Reply Brief p. 9).

## DISCUSSION

### Jurisdiction

Into this rather heated rhetorical skirmish steps this Court and, as a first threshold matter, notes that, as the parties agreed, it has jurisdiction under the PMPA, 15 U.S.C. § 2805(a) and 28 U.S.C. § 1331 (federal question) and § 1332 (diversity of citizenship).

### Preemption of State Unfair Trade Practices Law

The second threshold issue presented—whether the PMPA preempts North Carolina's unfair trade practices law as embodied in N.C. Gen. Stat. §§ 75–1.1, 25–1–102(3), and the common law—requires considerably greater attention. Exxon asserts that Williams' state law claims are "inapplicable to the termination issue" (Deft's Brief p. 13) because the PMPA preempts all statutory and common law claims. In response, Williams argues that Exxon's conduct which gave rise to the unfair trade claims, "while ultimately culminating in termination ... [of Williams' franchise] are independent of the scope of the PMPA."

(Ptf's Brief p. 27). The Court's inquiry into the proper parameters of the preemption issue, as spawned by the supremacy clause of the U.S. Constitution, Art. VI, cl. 2, and *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1,211 (1824), is simplified by Congress' enunciation of its legislative intent in § 106 of the PMPA, 15 U.S.C. § 2806(a). This provision reads, in pertinent part:

> To the extent that any provision of this subchapter applies to the termination ... [or nonrenewal] of any franchise relationship, no State ... may adopt, enforce, or continue in effect any provision of any law or regulation with respect to termination [or to the nonrenewal] of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter.

Thus, the Court's crucial determination is whether the state law speaks to termination or nonrenewal of a franchise relationship under the PMPA and, if so, whether the pertinent state provision is "the same as" the federal statute. *See generally Siecko v. Amerada Hess Corp.,* 569 F.Supp. 768, 772–73 (E.D.Pa.1983); *Meyer v. Amerada Hess Corp.,* 541 F.Supp. 321, 332 (D.N.J.1982); *Lyons v. Mobile Oil Corp.,* 526 F.Supp. 961, 962 (D.Conn.1981) (all summarily preempting state franchise laws).

The North Carolina statute primarily placed at issue by Exxon's preemption claim, N.C. Gen. Stat. § 75–1.1(a) (1981), simply but broadly provides that: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." Plaintiff Williams also alleges violations by Exxon of the common law duty of good faith and of N.C. Gen. Stat. § 25–1–102(3), North Carolina's UCC provision which dictates that "the obligations of good faith, diligence, reasonableness and care prescribed by this chapter may not be disclaimed by agreement." So, it is apparent that the allegedly offensive state laws do not speak directly to "the termination ... or nonrenewal of a franchise" but instead apply broadly to "all business activities, however denominated." N.C.Gen. Stat. § 75–1.1(b) (1981) (defining "commerce" as used in § 75–1.1(a)).

Indeed, the alleged unfair trade practices which Williams proffers as being independent of the PMPA arise from more general "business activities" rather than specifically from the termination of a franchise. For example, the plaintiff alleges a secret territorial allocation engendered by Exxon's consistent refusal to allow Williams access to the Selma, North Carolina distribution terminal. Williams also emphasizes Exxon's horizontal restraint of competition in allegedly designating Williams as a "no-growth" distributor.

In deciding a preemption question, the Court is ever mindful of the fact that "the exercise of federal supremacy is not lightly to be presumed." *Tousley v. North American Van Lines Co.,* 752 F.2d 96, 101 (4th Cir.1985) quoting *Schwartz v. Texas,* 344 U.S. 199, 203, 73 S.Ct. 232, 235, 97 L.Ed. 231 (1952). The Court also agrees that "Congress carefully tailored the preemptive effect of the PMPA, and [it] would betray its purpose by reaching unnecessarily to find conflict with state law." *Exxon Corp. v. Ga. Assn. of Petroleum Retailers,* 484 F.Supp. 1008, 1018 (N.D.Ga.1979) *aff'd sub nom. Exxon Corp. v. Busbee,* 644 F.2d 1030 (5th Cir.1981) *cert. denied,* 454 U.S. 932, 102 S.Ct. 430, 70 L.Ed.2d 239 (1981) (hereinafter cited as *Exxon Corp.*); *see also Lasko v. Consumers Petroleum of Connecticut, Inc.,* 547 F.Supp. 211 (1981).

■ Consistent with the duty of restraint imposed upon it by a preemption question and in recognition of the several state unfair trade claims which, although perhaps possessing more than a "fortuitous application", have little more than an "attenuated" relationship to this lawsuit over termination of a franchise, *Exxon Corp.,* 484 F.Supp. at 1018, this Court concludes that the PMPA, 15 U.S.C. § 2806(a), does not preempt N.C.Gen.Stat. §§ 75–1.1, 25–1–102(3) nor the common law duty of good faith dealing as they arise in this litigation.

*Termination of Williams' Franchise*

The Distributor Agreement executed by these litigants on May 13, 1981 was by its terms effective until March 31, 1984. Thus, it governs Williams' Fall, 1983 misbranding acts which allegedly allow a lawful franchise termination by Exxon. The operative provisions of the Agreement read:[4]

> 13. TRADEMARK: Buyer is permitted to display Seller's trademarks solely to designate the origin of said products and Buyer agrees that petroleum products of others will not be sold by Buyer under any trade name, trademark, brand name, label, insignia, symbol, or imprint owned by Seller or used by Seller in its business....

The "Termination" paragraph of the Agreement also contains the standard proviso that

> (a) This Agreement shall terminate:
> (b)(v) if Buyer [Williams] defaults in any of its obligations under this Agreement.

Under a traditional contract law analysis, these terms would, with the facts at bar, seem quite sufficient to allow Williams' termination. However, because the contractual relationship between Exxon and Williams constitutes a "franchise" under § 2801(1)(A) of the PMPA, the traditional analysis must also assimilate the federal statute.

As the defendant admits, the PMPA "was designed by Congress to establish 'protection for franchisees from arbitrary or discriminatory termination or non-renewal of their franchises.'" (Deft.'s Brief p. 9 and quoting S.Rep. No. 731, 95th Cong., 2d Sess. 15 (1978) *reprinted in* [1978] U.S. Code Cong. & Ad.News 873, 924). However, defendant also urges and this Court recognizes—as did Congress—that this "subject area required recognition of the legitimate needs of a franchisor to be able to terminate a franchise or not renew a

franchise relationship based on certain actions of the franchisee...." (Id. at 877).

Toward the goal of more clearly delineating which "certain actions" may properly trigger termination, the PMPA first requires the continuation of a franchise "except as provided in subsection (b)" of § 2802. This subsection specifies the permissible reasons, and requisite procedure to follow, for franchise termination. Under § 2802(b)(1)(A), a franchisor must first meet Section 2804's written, ninety day, certified mail or personal delivery termination notice requirement. Williams has acquiesced to the conclusion that Exxon's March 5, 1984 letter satisfies all the notification requirements. *See* 15 U.S.C. §§ 2802(b)(2)(C) and 2804(a).

In addition to adequate notice, Section 2802(b)(1) requires that the termination be premised on a basis specified in § 2802(b)(2). The operative ground on which the Court will uphold the termination in this case is § 2802(b)(2)(C) which provides, in pertinent part:

> (b)(2) ... the following are grounds for termination of a franchise...:
>> (c) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise ... is reasonable....

In a further effort to establish "a set of rules [which would] clearly define the rights and obligations of the parties to a franchise relationship in the crucial area of termination of a franchise", 1978 U.S.Code Cong. & Ad.News at 877, Congress provided specific examples of "an event which is relevant to the franchise ... and as a result of which termination ... is reasonable." The crucial example for the case at bar is found in § 2802(c)(10) which, in effect, proscribes *"willful* adulteration, mislabeling or *misbranding of motor fuels* or other trademark violations by the franchisee." (emphasis added).

This specification of misbranding as a relevant event upon which a reasonable

---

4. The identical language quoted here from paragraph 13 of the 1981 Agreement is also con-

tained in paragraph 11 of the 1984 Agreement.

termination can be based is expressly reiterated in the "Trademarks" paragraph of both of Williams' Distributor Agreements. In fact, the Agreements effectively duplicate § 2802(c)(10) by providing that "... it being understood and agreed that a breach of any provision of this section 13 is an event which is relevant to the franchise relationship ... and as a result of which termination of the ... relationship is reasonable."

Both the Exxon-Williams Agreement and the PMPA expressly authorize termination of Williams' franchise for the specific misbranding to which Williams' admits. At this stage, the only lingering issue is the willfulness *vel non* of Williams' misbranding. In essence, following *Haynes v. Exxon Co.*, 512 F.Supp. 543, 544 (1981) quoting *Gilderhus v. Amoco Oil Co.*, 1980–81 Trade Cas. (CCH) ¶ 63,648 (D.Minn.1980), the Court concludes that the "willful" requirement of § 2802(c)(10) contemplates "a conscious, intentional, deliberate and voluntary act, and that the provision does not require 'proof of bad motive, nor does evidence of good faith negate the willfulness of an act covered by said provision.'" It is also concluded that Williams' misbranding was willful within this definition. *See also H.R.H. Service Station, Inc. v. Exxon Corp.*, 591 F.Supp. 25 (1983). Plaintiff has admitted to consciously and deliberately selling non-Exxon gas without deidentifying the pertinent Exxon-branded stations and, under the now relatively well-developed law, this conduct is "willful." Mr. Williams' good faith or ignorance of his franchisee responsibilities is irrelevant to this determination. Exxon has fulfilled its burden under § 2805(c) of proving willfulness.

In opposition to the termination and the motion now at issue, the plaintiff argues at length that, *inter alia,* Mr. Williams had not read the Agreement and was "not aware of any contractual prohibition against misbranding." (Pltf.'s brief at 13). Since it has been a well settled "general rule" for almost a century that "one who signs a contract is presumed to know its contents ..." *Ellis v. Mullen,* 34 N.C.App. 367, 369 238 S.E.2d 187, 189 (1977) the Court will give this argument the consideration it merits and summarily dismiss it. *See generally Dellinger v. Gillespie,* 118 N.C. 737, 24 S.E. 538 (1896) through *Biesecker v. Biesecker,* 62 N.C.App. 282, 302 S.E.2d 826 (1983).

The Court also deems it unnecessary to consider the fiduciary duty proposition and the various other "defenses" to the termination action proffered by the plaintiff. While it is conceivable that some of the arguments may have some relevance to the state unfair trade practices claims, the plaintiff's signing without knowledge defense and "civil entrapment" theory at least approach the "frivolous" sort of action for which the PMPA's § 2805(d)(3) authorizes the imposition of "attorney and expert witness fees" against the franchisee. However, the Court will not exercise its discretion to tax these costs at this time.

The Court will utilize its discretion to also conclude that, having found the termination of Williams' franchise lawful under the Agreement and the PMPA because of Williams' misbranding, it need not reach nor consider the merits of the three remaining grounds posited by Exxon as justifications for the termination.

### SUMMARY

Having construed all the facts in the light most favorable to the plaintiff L.C. Williams Oil Co. and yet still determined that there exists no "genuine issue as to any material fact," the Court concludes that the defendant Exxon Corp. is "entitled to [partial summary] judgment as a matter of law" as to the franchise termination issue. F.R.Civ.P. 56(c). Accordingly, the defendant's motion is granted and Williams' original prayer for a preliminary injunction under the PMPA, 15 U.S.C. § 2805(b)(2), is rendered moot. The Court further concludes that the PMPA does not preempt the plaintiff's unfair trade practices claims under N.C. Gen. Stat. §§ 75–1.1, 25–1–102(3), and the common law duty of

good faith. These state law claims shall be retained on this Court's docket under its diversity jurisdiction for a subsequent disposition.