**John J. LASKO, Jr., dba Sasco Hill Texaco, Plaintiff,**

v.

**CONSUMERS PETROLEUM OF CONNECTICUT, INC., Defendant.**

**Civ. No. B 81–386.**

United States District Court,
D. Connecticut.

Oct. 27, 1981.

---

Richard Farrell, Albert J. Barr, Abate, Fox & Farrell, Stamford, Conn., for plaintiff.

David Schaefer, Brenner, Saltzman & Wallman, New Haven, Conn., for defendant.

### RULING ON PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

DALY, District Judge.

Plaintiff, John J. Lasko, the franchisee-proprietor of a gasoline service station in

Fairfield, Connecticut, has brought this action for an injunction and damages, claiming that defendant-franchisor, Consumers Petroleum of Connecticut (Consumers), is attempting to terminate his franchise in violation of the federal Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801, *et seq.* and the Connecticut Franchise Act, 18 Conn.Gen.Stats. § 42–133e *et seq.* The case is currently before the Court on plaintiff's motion for a Preliminary Injunction.

## I. THE FACTS

Plaintiff operates what is now a Texaco service station located on the Post Road in Fairfield, Connecticut. Defendant is a corporate distributor of Texaco gasoline and gasoline products and the owner of the lot on which plaintiff's station is located. Nine years ago, plaintiff and Consumers entered into a written lease of the Fairfield service station, effective October 1, 1972.[1] By its terms, the lease was to run for one year, from October 1, 1972 to September 30, 1973, and thereafter from month to month unless terminated upon 30 days notice by either party. Plaintiff was to pay rent to Consumers in the amount of $300 per month plus one and one-half cents per gallon of gasoline over 20,000 gallons sold. From October 1972 until February 1978, at Consumers' direction, plaintiff ordered his petroleum products directly from the American Oil Co. (Amoco) and paid Amoco directly.

For several years prior to plaintiff taking possession of the station, the premises had been operated as an Amoco-brand service station. Pursuant to a long-standing agreement[2] between Consumers and Amoco, Amoco, which owned the pumps and other station equipment, was to pay Consumers one and one-half cents per gallon of gasoline it delivered to the station. This agreement was entered into apparently to induce Consumers to lease the premises for use as an Amoco station. Although Consumers did not distribute or sell Amoco products, it was amenable to this arrangement since it was already supplying a service station down the road with Texaco products, and there was no sense in Consumers competing with itself for the same Texaco customers. The Amoco-Consumers agreement continued through the first year of the Lasko-Consumers lease, until Amoco terminated its agreement with Consumers, effective October 31, 1973. Thereafter, Consumers received no payments from Amoco, but plaintiff, as Consumers' tenant, continued to deal in Amoco products and to accept Amoco credit cards.

On March 6, 1974, Consumers purchased from Amoco all the gasoline-sales equipment on the premises, including the pumps and tanks, but excluding the Amoco sign. On the same date, plaintiff entered into an Equipment Loan Agreement with Amoco, pursuant to which Amoco leased its Amoco sign to plaintiff. This agreement was specifically approved by Mr. Ernest A. Wiehl, Jr., and Mr. William H. Wiehl, President and Vice President, respectively, of Consumers.

Over the years, plaintiff agreed to a number of rent increases demanded by Consumers. The first followed on the heels of Amoco's termination of its one-and-one-half-cents-a-gallon agreement with Consumers and raised plaintiff's rent to a flat $475 per month, with no per gallon charges, beginning November 1, 1973. In August, 1977, the rent was increased to $675 per month, and on June 1, 1979, it went up to the current rate of $800 per month.

In late 1977 and early 1978, plaintiff and representatives of Consumers discussed

---

**1.** At the same time, plaintiff and Consumers signed a Sales Agreement, pursuant to which plaintiff was to purchase a specified amount of gasoline from defendant. This contract was apparently never acted upon, and, therefore, the Court finds, as a preliminary matter at least, that the 1972 Sales Agreement was abandoned.

**2.** The latest rendition of this agreement was a 1967 written contract between Amoco and Consumers. This contract, as noted below, remained in effect until Amoco terminated it as of October 31, 1973.

plaintiff's changing from an Amoco to a Texaco service station. The change was sought by Consumers because the nearby Texaco station, which defendant had been supplying with gasoline products, had ceased operating and there was no longer any problem of defendant, as a Texaco distributor, competing with itself. According to plaintiff's testimony at the hearing, he acquiesced in the switch, albeit reluctantly, fearing the loss of a number of his regular Amoco gasoline and repair credit-card customers, because he was told by Consumers that he would be subjected to greater rent increases if he did not, and because he felt he had no choice in the matter. Plaintiff and Consumers then entered into an oral agreement, effective February 2, 1978, whereby plaintiff became a Texaco dealer and began purchasing all his petroleum and related products from the defendant. Although plaintiff had always dealt directly with Amoco himself, Consumers notified Amoco of the station's switch to Texaco products.

In the latter part of 1979, Consumers was presented with a feasibility study concerning the development of the property occupied by the service station. The study concluded that construction of a multistory office building would be the best use of the property and that the service station would have to be eliminated. Then, in the summer of 1980, Consumers began negotiations with Merrimac Associates, a real estate developer, on a proposed office building development scheme for the site. The proposal called for Merrimac to pay a ground rent of between $45,000 and $50,000 per year for the property. The negotiations faltered when Merrimac's enthusiasm cooled considerably because of the rising interest rates in 1981. Consumers claims it is currently engaged in negotiations with a new developer for a plan that would earn Consumers a similar amount in ground rent—substantially greater than what it is currently receiving from the plaintiff.

On September 9, 1980, presumably while it was still negotiating with Merrimac Associates, Consumers sent a notice by certified mail to plaintiff, informing him that Consumers would not renew its lease and supply arrangement with plaintiff for a further term and that the arrangement would terminate as of June 19, 1981. In the letter notice, Consumers explained the nonrenewal/termination was the result of its decision to convert the premises to a use other than the sale or distribution of gasoline. A second, certified-mail notice from Consumers, dated June 1, 1981, confirmed the "notice of termination," but extended the termination date to August 31, 1981.

On August 19, 1981, plaintiff filed his complaint in this action, seeking to prevent Consumers from terminating or failing to renew his franchise. At the same time, plaintiff applied for a Temporary Restraining Order, which application was denied by Judge Burns in New Haven upon Consumers' assurance that it would maintain the status quo and continue supplying plaintiff with Texaco products until a decision was rendered on plaintiff's motion for a Preliminary Injunction. At the evidentiary hearing, Consumers again assured this Court that it would take no action pending the decision on the Preliminary Injunction.

## II. THE ISSUES

The issues in dispute in this case are threefold:

(a) Whether a provision in Connecticut's Franchise Act, Conn.Gen.Stats. § 42–133e *et seq.*, which mandates minimum initial terms of 3 years and automatic three-year renewals, if not properly terminated or nonrenewed, for all Connecticut petroleum product franchises applies, or whether it was preempted by the federal Petroleum Marketing Practices Act, 15 U.S.C. § 2801, *et seq.* (PMPA).

(b) Whether Plaintiff's franchise commenced in October of 1972, when plaintiff first began operations on the premises, as plaintiff contends, or not until February 1, 1978, when the switch from Amoco to Texaco was effectuated and Consumers began supplying Texaco products to the station, as defendant contends.

(c) Whether defendant's notices constituted termination or nonrenewal of plaintiff's franchise, and whether such termination or nonrenewal is in violation of PMPA.

The first of these issues turns solely on a question of law, and, thus, a final determination may be reached on the question of preemption. The other two issues involve both questions of fact and of law for which preliminary findings and conclusions may be reached.

### A. PMPA'S Preemption of State Law.

■ The Petroleum Marketing Practices Act, 15 U.S.C. § 2801, *et seq.* was enacted to protect franchisees from arbitrary or discriminatory termination and nonrenewal of their franchises. *See, Munno v. Amoco Oil Co.,* 488 F.Supp. 1114, 1118 (D.Conn.1980). The legislative history of the Act reveals that Congress was primarily concerned with the often vast disparity in bargaining power which exists between franchisors and franchisees. *See, generally,* S.Rep.No.95–731, 95th Cong.2d Sess., 15–19 (1978), *reprinted in* [1978] U.S.Code Cong. & Admin. News 873–77. Hence, the centerpiece of the Act lies in its prohibition against a franchisor terminating or refusing to renew a franchise, except for the reasons specified in the Act, *see,* 15 U.S.C. § 2802, and in the stringent notice requirements it imposes on a terminating or nonrenewing franchisor, *see,* 15 U.S.C. § 2804. The Act, then, is directed first and foremost at the permissible *grounds* for termination or nonrenewal of franchises and at the *manner* in which such termination or nonrenewal is effectuated, or, in other words, at the why and how of ending a franchise.

The specific provision of the Connecticut Franchise Law at issue here, Conn.Gen. Stats. § 42–133*l* (c), provides that

[N]o franchise entered into or renewed on or after October 1, 1973, whether oral or written, shall be for a term of less than three years and for successive terms of not less than three years thereafter unless cancelled, terminated or not renewed pursuant to subsections (a) and (d) of this section.

Very clearly, this section of the Connecticut statute applies to the duration, or one of the substantive terms of a franchise agreement, and not to the grounds for termination or nonrenewal, nor to the kinds of notice which a franchisor must afford a franchisee. Thus, unless Congress intended to preempt all state provisions involving the substantive aspects of petroleum-products franchises, this section of the Connecticut law could not be deemed to have been preempted. The Court need not guess at Congressional intent, since Congress spoke directly and specifically to the question of preemption in § 106 of PMPA, 15 U.S.C. § 2806, which states:

(a) To the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, no State ... may adopt, enforce, or continue in effect any provision of any law or regulation ... *with respect to termination (or the furnishing of notification with respect thereto) of any such franchise or to the nonrenewal (or the furnishing of notification with respect thereto) of any such franchise relationship* unless such provision of such law or regulation is the same as the applicable provision of this subchapter. (Emphasis added.)

Thus, although it is clear that the sections of the Connecticut statute which establish permissible bases for termination and nonrenewal and the kind of notice that is required (See, Conn.Gen.Stats. §§ 42–133*l* (a), (d) and (e)) were preempted by 15 U.S.C. § 2806(a), that part of the Connecticut statute which simply sets minimum terms for gasoline franchises was not preempted.

Defendant argues that PMPA itself contains minimum franchise terms in certain carefully delineated circumstances, and, therefore, the lack of a blanket requirement for a minimum term for franchises indicates a conscious decision by Congress not to define or regulate the termination or nonrenewal of franchises in that manner.

The Court is in agreement with defendant up to this point, but differs from defendant's conclusion that Connecticut's minimum franchise requirement is "wholly inconsistent" with those contained in PMPA and therefore must be held to have been preempted. First, of the three sections of PMPA which speak to the duration of franchises,[3] only one, 15 U.S.C. § 2802(b)(3)(D)(i)(I) is at all relevant to this case. That section of PMPA establishes as a ground for nonrenewal a good faith determination by the franchisor "to convert the leased marketing premises to a use other than the sale or distribution of motor fuel," but makes such determination a *permissible* ground only if the franchise was entered into for a term of three years or longer. Hence, the Connecticut three-year requirement is completely consistent with this section of PMPA. What is more, defendant is relying in this case on the very grounds set out above to justify its ending of the franchise relationship, yet, without the Connecticut statute's requirement of three-year minimum terms, it would have no permissible basis under PMPA for attempting to nonrenew plaintiff's franchise.

Second, the conclusion to be drawn from Congress's decision not to establish a blanket rule regarding the minimum term of franchises is not that Congress meant to prohibit such terms altogether, as defendant appears to contend, but rather that Congress intended that such substantive terms be worked out by the parties themselves and/or be regulated by the States.

■ Defendant's reliance on *Munno v. Amoco Oil Co.,* 488 F.Supp. 1114 (D.Conn. 1980) for the proposition that the Connecticut three-year term requirement was preempted by PMPA is misplaced. There, Judge Blumenfeld, in discussing whether the failure to renew in that case occurred before or after the effective date of PMPA, stated that when the parties failed to agree to renewal terms by the time the lease had expired, they would be deemed, under Connecticut law, to have agreed to a month-to-month tenancy. This is, of course, a correct

statement of Connecticut's real property law. However, Judge Blumenfeld also noted that "in spite of numerous invitations, the plaintiff has failed to set forth his claimed violations [of state franchise] laws with sufficient specificity to enable this Court to consider them." *Id.* at 1115, fn. 1. Thus, the specific provision of Connecticut law at issue here was never placed before the Court for consideration. Furthermore, Judge Blumenfeld's statement that "claims arising under Connecticut's *nonrenewal* and *termination* statutes need not be considered ... since, to the extent that they differ from the federal statutes, the Connecticut statutes are expressly preempted by the PMPA," *Id.* at 1115–16, fn. 1 (emphasis added), merely reaffirms what has already been stated here and cannot be construed as a ruling that § 42–133*l*(c), which merely sets minimum terms for petroleum franchises, was preempted by PMPA.

In addition, Chief Judge Clarie, in *Ted's Tire Service, Inc. v. Chevron U. S. A., Inc.,* 470 F.Supp. 163, 165 (D.Conn.1979), specifically noted that "15 U.S.C. § 2806(a) manifests a Congressional intent to treat state laws which govern petroleum franchises as severable," which supports this Court's conclusion that § 42–133*l*(c) of the Conn.Gen. Stats. was not preempted, while other parts of the same statute were voided by PMPA. Judge Clarie's comment that a "Court would not enforce any provisions [of state law] which are different from those of the PMPA," must be taken in the context in which it was made, *i.e.* in construing the narrow and specific preemption section of PMPA, which, by its terms, applies only to termination or nonrenewal and notification provisions of state laws.

The only reported decision which specifically deals with preemption of State law by PMPA, *Exxon Corp. v. Georgia Association of Petroleum Retailers,* 484 F.Supp. 1008 (N.D.Georgia, 1979), also supports the conclusion arrived at here. In *Exxon,* the Court held that PMPA preempted §§ 106–

---

**3.** 15 U.S.C. § 2802(b)(2)(E); 15 U.S.C. § 2802(b)(3)(D); 15 U.S.C. § 2803.

1104(j)[4] and (k) of the Georgia Code, both of which established grounds for termination or renewal. However, the Court also held that PMPA did *not* preempt § 106–1104(i) of the Georgia Code, which prohibits franchisors from requiring, as a term of the franchise agreement, service station dealers to operate in excess of 6-day weeks or 12-hour days. The Court, in upholding the provision against a preemption attack, noted that the provision dealt with a substantive term of a franchise, "and could have at best some fortuitous and attenuated application to . . . termination or nonrenewal of a franchise relationship." *Exxon, supra,* 484 F.Supp. at 1018. Similarly, the Connecticut provision at issue here certainly affects *when* a nonrenewal might be carried out, but it does not affect the *why* or *how* of franchise termination or nonrenewal, which is what PMPA is concerned with.

Finally, defendant argues that if a state minimum term and automatic renewal statute such as Connecticut's is allowed to stand, a franchisor who has permissible grounds for nonrenewal of a franchise would be forever prohibited from nonrenewing solely because of the minimum franchise term set by state law. This argument misconstrues both federal and state law. First, under PMPA, a franchisor cannot fail to renew a franchise until the expiration date or conclusion of the term, no matter how long the term may be. *See,* 15 U.S.C. §§ 2801(14)(A) and 2802(a) and discussion, *infra,* at 220. Second, the Connecticut statute does not prohibit a franchisor from *ever* terminating or nonrenewing a franchise, it simply requires that a franchise will be automatically renewed at the conclusion of a term for a new three-year term *if* not properly terminated or nonrenewed. And, of course, what constitutes proper nonrenewal or termination is now determined by PMPA.

■ Therefore, the Court holds that Conn.Gen.Stats. § 42–133*l*(c), which requires that all petroleum product franchises be for a minimum term of three years and that such franchises are automatically renewed for successive three-year terms if not properly terminated or nonrenewed, was not preempted by the federal Petroleum Marketing Practices Act, 15 U.S.C. § 2806(a).

### B. *When the Franchise Relationship Began*

Plaintiff contends that his franchise relationship with Consumers began on October 1, 1972, when he first took possession of the premises. Consumers, on the other hand, argues that no franchise relationship existed between the parties until February 1, 1978, when Consumers, as a Texaco distributor, authorized plaintiff to use the Texaco trademark and first began supplying plaintiff with Texaco products.

The term "franchise" is defined in 15 U.S.C. § 2801(1)(A) as

"any contract—

(i) between a refiner and a distributor,

(ii) between a refiner and a retailer,

(iii) between a distributor and another distributor, or

(iv) between a distributor and a retailer

under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

15 U.S.C. § 2801(1)(A).

The statute goes on to state that the term "franchise" includes

---

4. The last paragraph at 484 F.Supp. 1017 states that § 106–1104*(i)* violates federally preempted territory; however, this is obviously a typographical error, substituting (i) for (j), since the Court specifically upheld subsection (i) (see 484 F.Supp. at 1018), which, as noted above, is similar to the Connecticut provision at issue here in that it deals with the substantive terms of a franchise, and the Court later clearly declared § (j), not (i), preempted (see 484 F.Supp. at 1021).

"(i) any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy."

15 U.S.C. § 2801(1)(B).

 Under a literal reading of the statute, a franchise could be said to exist between a retailer and a distributor of gasoline only if an oil refiner, whose trademark is being authorized for use, actually *supplies* motor fuel to the authorizing distributor. Were the Court to construe the statute in this manner, there would be no question that no franchise existed until February 1, 1978, when Consumers, as an authorized Texaco distributor, first began supplying petroleum it received from Texaco to plaintiff. The Court believes, however, that Congress, in defining "franchise," focused its attention on the usual three-party chain of authorization—that is, a refiner who supplies petroleum to a distributor and authorizes the use of its trademark by such distributor, who in turn sells the product to a tenant retailer and authorizes the retailer to use the refiner's trademark. But, given the otherwise broad definition of franchise (e.g. "any contract," including leases), there is no reason to suppose that Congress meant to exclude the somewhat unusual case, such as exists here, where the distributor has control over the trademark under which the retailer operates, even though the *refiner,* whose trademark is being used, does not supply the distributor with gasoline, but rather supplies the retailer directly. It is the party who controls what trademark the retailer uses that Congress was concerned with, not necessarily the party who supplies the petroleum. In this case, it appears from the evidence thus far produced that it

was Consumers, not Amoco, who controlled what brand of gasoline plaintiff sold.

When plaintiff entered into his lease with Consumers on October 1, 1972, Consumers most certainly "authorized" and "permitted" plaintiff to use the Amoco trademark. In fact, since the Amoco-Consumers agreement (by which Amoco agreed to pay Consumers one and a half cents per gallon of gasoline delivered to the station) was in effect on that date and continued through the initial year of plaintiff's lease, plaintiff's use of the premises *as an Amoco station* (and, hence, his use of the Amoco trademark), would appear to have been an implied condition of his taking possession of the premises.[5] It thus appears that Consumers controlled what brand of gasoline plaintiff sold from day-one of his lease.

Amoco terminated its agreement with Consumers effective October 31, 1973. However, the fact that Consumers ceased receiving a penny and a half a gallon from Amoco does not appear to have diminished Consumers' control over which trademark plaintiff operated under. In fact, once the Amoco-Consumers agreement was terminated, Consumers was apparently completely free to require plaintiff to cease selling Amoco products and to begin selling under any other trademark Consumers chose. The control which Consumers exercised over plaintiff in this regard is evidenced by the fact that it was able to require a reluctant John Lasko to switch to Texaco in February of 1978, after Consumers' nearby Texaco station had ceased operations. In addition, the Equipment Loan Agreement, entered into by plaintiff and Amoco in 1974 by which Amoco leased its Amoco sign to plaintiff, apparently required the approval and consent of Consumers, which was given by the company's President and Vice President. Also, when the switch to Texaco was made, although plaintiff had dealt directly with Amoco for six years, it was Consumers, not plaintiff, who notified Amoco, and

---

5. To be sure, Amoco also "permitted" plaintiff to use its trademark, and could have enforced its agreement with Consumers to require that the station be operated as an Amoco station. Nevertheless, it was Consumers' decision to enter the agreement with Amoco, apparently to avoid competing with the nearby Texaco station which Consumers was already supplying.

Amoco appears to have had no say whatsoever in the matter.

Because, on the basis of the record thus far produced, Consumers apparently exercised sole and absolute control over which brand of gasoline was sold at the station leased by plaintiff, the Court finds, as a preliminary matter at least, that the franchise began on October 1, 1972, the effective date of plaintiff's lease of the premises, and that such franchise continued, uninterrupted, through the termination of the Amoco-Consumers agreement and the switch to Texaco.

■ The next determination to be made is the latest date on which plaintiff's franchise was up for renewal, which depends on when the Connecticut statute, mandating three-year terms for petroleum product franchises, became effective as to plaintiff's franchise. The Connecticut Franchise Act, as originally enacted (*see*, Conn.Gen.Stats. § 42–133e to 42–133h) applied generally to all franchises and became effective on October 1, 1972. Conn.Gen.Stats. § 42–133h. However, § 42–133*l*(c) the section of the Connecticut Franchise Act at issue in this case, only became effective as of October 1, 1977. *See*, Conn.Gen.Stats. § 42–133j(b).[6] Plaintiff's franchise which was originally governed by this lease with Consumers was, according to the terms of that lease, to run for one year from October 1, 1972 until September 30, 1973, and thereafter from month to month. The franchise thus was renewed on a month-to-month basis from September 30, 1973 until October 1, 1977, when § 42–133*l*(c), requiring three-year terms for all petroleum product franchises "entered into or renewed on or after October 1, 1973," went into effect. Plaintiff's franchise was then automatically renewed, pursuant to the state law, for a three-year term, beginning October 1, 1977 and running until September 30, 1980. If not properly terminated or nonrenewed pursuant to the grounds and notification requirements of PMPA, the franchise would again be automatically renewed for another three-year term beginning October 1, 1980 and ending September 30, 1983.

## C. The "Termination" or "Nonrenewal" Notices.

PMPA defines "nonrenewal" of a franchise as a "failure to reinstate, continue, or extend the franchise relationship ... *at the conclusion of the term or on the expiration date* stated in the relevant franchise." 15 U.S.C. § 2801(14)(A). "Termination," on the other hand, is defined merely as "includ[ing] cancellation," 15 U.S.C. § 2801(17), indicating that, while a nonrenewal may be effectuated only at the end of a term, a termination may be carried out at any time during the franchise relationship, provided, of course, that proper grounds exist in either case.

■ Consumers' first notification to plaintiff that it intended to end the franchise relationship was a letter dated September 9, 1980. The letter itself speaks in terms of both nonrenewal and termination, but regardless of the language Consumers itself used in its letter, it is ultimately for the Court to determine whether a nonrenewal or termination was to result. The stated reason for ending the franchise was that Consumers had decided, in good faith, to convert the premises to a use other than the sale or distribution of motor fuel.

Assuming the Court's preliminary conclusions prove true after trial and plaintiff's first three-year term was indeed due to expire (and, hence, was ripe for nonrenewal under PMPA) on September 30, 1980, the September 9, 1980 letter would fail to be effective as a notice of *nonrenewal* because it fell far short of the 90-days prior notice required for nonrenewal (or termination) by 15 U.S.C. § 2804(a)(2).

■ Consumers voices the argument that, since the Connecticut statute sets only a minimum term, and since no definite term was stated in the franchise agreement (oth-

---

**6.** Section 42–133*l*(c) was part of a 1977 amendment to the Connecticut Franchise Act, Conn. P.A. 77–493; Conn.Gen.Stats. §§ 42–133j to 42–133n, which made the Act specifically applicable to petroleum product franchises.

er than a month-to-month term after the initial year of the lease, which became inoperative on the effective date of the Connecticut statute), plaintiff's term could have been for three years and eight months, which would make the September 9, 1980 notice effective for a nonrenewal to occur, as the letter stated, on June 19, 1981. However, the Connecticut statute cannot be construed to provide that, if no term is specified, the term may be for three years plus any fraction thereof which the franchisor may unilaterally decide, without laying waste to the very protections against arbitrary treatment by franchisors which the state law was designed to create. Rather, Connecticut's statute must be construed to require, as a condition of all gasoline franchises, a term of no less than three years under any circumstances and no more than three years unless the parties specifically agree to a longer term. That being so, plaintiff's franchise, would have automatically been renewed on October 1, 1980, for a second three-year term to run until September 30, 1983. And, since under PMPA a nonrenewal may be effectuated only at the *end* of a term an attempt by Consumers to nonrenew the franchise on June 19, 1981, eight and a half months into the new term, would be equally ineffective. Consumers' June 1, 1981 notice, purporting to extend the expiration date to August 31, 1981, would be equally invalid, if not more so, as the franchise would then have proceeded 11 months into the new term.

■ Both the September 9, 1980 and the June 1, 1981 letters would also fail to effectuate a *termination,* to occur on June 19 or August 31, 1981, because the stated reason for ending the franchise, *i.e.* conversion of the premises to a different use, is a valid ground under PMPA only for nonrenewal, 15 U.S.C. § 2802(b)(3)(D)(i)(I), not for termination, *see,* 15 U.S.C. §§ 2802(b)(2)(A) through (E).

## III. PRELIMINARY INJUNCTIONS UNDER PMPA

PMPA establishes its own fairly liberal standard for the issuance of a preliminary injunction. This standard is set forth in 15 U.S.C. § 2805(b)(2), which states:

> . . . the court shall grant a preliminary injunction if—
>
> (A) the franchisee shows—
>
> (i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and
>
> (ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and
>
> (B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

*Cf. Caulfield v. Board of Education of New York,* 583 F.2d 605, 610 (2d Cir. 1978) (Second Circuit's general preliminary injunction standard).

■ As the statute indicates, the franchisee has the burden of showing that the franchise has been terminated or nonrenewed. There is no disagreement that the franchise has been terminated or nonrenewed. Plaintiff has continued to be supplied with Texaco products and the status quo has been maintained only by virtue of Consumers' voluntary agreement to not take any action pending this Court's decision on the motion for a preliminary injunction. Thus, the first prong of the test has been satisfied.

■ As to the second part of the test, once termination or nonrenewal has been proven, the franchisor has the burden of coming forward with evidence, as an affirmative defense, that such termination or nonrenewal is permissible under PMPA. 15 U.S.C. § 2805(c). If such evidence is forthcoming, the burden shifts back to the plaintiff-franchisee to show the continued existence of sufficiently serious questions going to the merits. *See, Escobar v. Mobil Oil Co.,* 522 F.Supp. 593 (D.Conn.1981) (Burns,

J.). In other words, the plaintiff-franchisee must overcome the franchisor's evidence of an affirmative defense to such a degree as to show that serious questions of the validity of the termination or nonrenewal remain, notwithstanding the franchisor's evidence of proper termination or nonrenewal.

■ In this case, the plaintiff-franchisee has shown that serious questions going to the merits of the action continue to exist, despite Consumers' assertion and evidence of proper and timely nonrenewal. One such question, as to which the Court has reached a preliminary conclusion, is whether Consumers' notices constituted a nonrenewal or termination. That question is dependent on a final resolution of the issue of precisely when plaintiff's franchise began, which in turn depends on the degree of control that Consumers exercised over the trademark that plaintiff used at his service station. Thus, the second half of the plaintiff-franchisee's required showing has also been satisfied.

As to the balance of hardships, the record indicates that plaintiff's sole source of income is the service station franchise which Consumers is seeking to bring to an end. Consumers, on the other hand, is a large corporation with gross annual revenues of approximately $15,000,000. The lot on which plaintiff's service station is located represents only one, relatively minor source of income for Consumers. Although it is true that delay in removing plaintiff's station from the lot might hinder Consumer's plan for redevelopment of the property, any injury to Consumers at this point, particularly when it has no firm commitment from any real-estate developer, is conjectural. The harm that plaintiff would suffer, however, if Consumers were permitted to eject him from the service station is immediate and severe.

For the foregoing reasons, the Court concludes that plaintiff is entitled to a preliminary injunction prohibiting Consumers from terminating or failing to renew plaintiff's franchise.

It is SO ORDERED.

Dated at Bridgeport, Connecticut this 27th day of October, 1981.