In the Matter of Gerald W. MOODY and Jermoo's Incorporated, Debtors.

Gerald W. MOODY and Jermoo's Incorporated, Plaintiffs,

v.

AMOCO OIL COMPANY, Defendant.

Adv. No. 83–0113.

United States Bankruptcy Court, W.D. Wisconsin.

June 2, 1983.

Michael P. Erhard, Michael B. Van Sicklen, Foley & Lardner, Madison, Wis., for plaintiffs.

Gregory E. Scallon, Stafford, Rosenbaum, Rieser & Hansen, Madison, Wis., for defendant.

## MEMORANDUM DECISION

ROBERT D. MARTIN, Bankruptcy Judge.

The chapter 11 debtor, Jermoo's, Inc., operates three retail gasoline stations under franchise-dealership contracts with Amoco Oil Co. The debtor is also a wholesale supplier of petroleum and related products under a jobbership contract with Amoco. The debtor has petitioned the court for a judgment declaring that the dealership and jobbership agreements are executory contracts which may be assumed pursuant to 11 U.S.C. § 365(a). In the alternative, the debtor seeks an injunction preventing Amoco from taking any action to terminate the agreements.

On January 26, 1983, First Bank (N.A.) (La Crosse Division) ("bank") seized the $62,300.16 balance in debtor's checking account, claiming a right to setoff against a promissory note given by the debtor. The bank then closed the account and dishonored all checks drawn on the account.[1] Among the checks dishonored were 4 made payable to Amoco. On January 27 and 28,

Amoco gave oral and written notice of the dishonor, and informed the debtor that it had 5 days in which to cure, pursuant to paragraph 5(b) of the dealership contracts.[2]

Representatives of the debtor and Amoco met on January 31, 1983 in an attempt to settle all disputes surrounding the dishonored checks. The debtor's attorney suggested that a chapter 11 filing was a possible option. Preliminary schedules and a chapter 11 petition had in fact been prepared and signed. Amoco made no promises at the meeting, and shortly thereafter rejected debtor's settlement proposals.

The debtor did not cure the defaults, and on February 3, 1983 Amoco sent notices that debtor's Mauston and Oakdale dealership contracts were terminated, effective 90 days from the date of the letter. The notices were sent by certified mail, postmarked at Brookfield, Wisconsin, February 3 and received by the debtor at Mauston February 4, 1983. Debtor continues to operate the stations, receiving gasoline from Amoco on a C.O.D. basis.

The debtor has been in arrears on his jobbership account since September of 1981. In August of 1982 Amoco first gave notice of its intent to terminate the jobbership contract, effective in November of 1982. After some negotiations wherein debtor informally agreed to give additional security and sell the Oakdale station, Amoco agreed not to proceed with the termination. Additional security was never provided, nor was Oakdale sold. On February 1, 1983, Amoco mailed notice of termination of debtor's jobbership contract, but gave the debtor 15 days in which to cure, as required by the jobbership contract.[3] Debtor did not cure

---

1. The bank's right to setoff is the subject of a separate adversary proceeding commenced by the debtor against the bank.

2. Paragraph 5(b) provides:
   Lessor shall have the right to impose a reasonable service charge against Lessee, in conformity with Lessee's class of trade in Lessee's area, for each check, if any, covering rent and/or other obligations of Lessee to Lessor which may be returned to Lessor for Non Sufficient Funds and which may subsequently be made good by Lessee. Failure of Lessee to make good, within five (5) days

after written notice is delivered by Lessor, any check which shall be dishonored for Non Sufficient Funds shall entitle Lessor, at Lessor's option, to terminate this Lease, without prejudice to any other remedies of Lessor at law or in equity.

3. Paragraph XVI of the jobbership contract provides in relevant part:
   Default: In the event of any breach of any provision of this contract by either party or in the event of any failure of either party to exert good faith efforts to carry out the provisions hereof, the other party, at its option,

the arrearage during the following 15 days, or at any time thereafter.

On February 4, 1983, debtor filed its chapter 11 petition. On that date the 5 days in which the defaults under the dealership contracts could be cured had passed, but the effective date of termination, (90 days from the date of notice) had not passed. As of the date of filing, the 15 days in which the jobbership contract could be cured had not passed.

The court is presented with two separate questions: 1.) Are the dealership and jobbership contracts executory contracts which may be assumed by the debtor? 2.) Is the debtor entitled to injunctive relief? For the reasons set out below, the court concludes that both questions must receive a negative answer.

■ The initial question does not turn on the general character of the contracts and whether they were within the accepted definitions of executory contracts, but rather upon the vitality of those contracts under their own terms. The debtor may only assume a contract as it existed at the time of filing. If the contracts were not terminated before debtor filed, they may be assumed. *In Re Varisco,* 16 B.R. 634 (Bkrtcy. M.D.Fla.1981). If they were terminated, they may not be assumed. *In Re Bronx-Westchester Mack Corp.,* 4 B.R. 730 (Bkrtcy.S.D.N.Y.1980). *In Re Benrus Watch Co. Inc.,* 13 B.R. 331 (Bkrtcy.S.D.N.Y.1981).

■ In *Bronx-Westchester* a truck dealer operated under a distributorship agreement with Mack Trucks, Inc. The dealer's account with Mack was approximately $150,000.00 past due, so the two parties met in an attempt to resolve the dealer's financial problems. At the meeting Mack's representatives expressly agreed not to send a termination notice before their next meeting when more financial information would

be available. Shortly thereafter, Mack sent a notice terminating the distributorship agreement, effective immediately. The debtor then filed its chapter 11 petition. The debtor sought to assume the distributorship contract arguing that it could "cure," or that Mack was estopped from terminating the contract. Judge Schwartzberg found no right to cure under the bankruptcy law:

> Since this court holds that it does not have the power to permit a pre-petition contract termination to be cured in the same fashion as a pre-petition default under an existing contract, it necessarily follows that Bankruptcy Code § 365(b), which deals with the curing of defaults under existing contracts is of little comfort to the debtor.

*Id.* at 733. Applying its equitable powers however, the court held that Mack was estopped from relying on the termination notice since the debtor's attorney had delayed filing in reliance on Mack's promise not to terminate the contract. Although the evidence in this case suggests that the debtor delayed filing after meeting with Amoco, there is no evidence that Amoco invited that delay by any promise to postpone or forego its right to terminate. No basis for estopping Amoco's termination has been presented in this case.

In *Benrus Watch* the debtor was in default of an agreement to pay royalties. Pursuant to the terms of a license agreement, the debtor was notified that it had 30 days in which to cure defaults, and failing that, the agreement would be terminated. When debtor did not cure, the contract was terminated. Debtor then filed its chapter 11 petition and challenged the termination. Judge Babitt found that the agreement could not be revived stating:

> It is a settled principle of law that a contractual termination provision survives the filing of a petition in bankrupt-

---

may terminate this contract on 90 days' prior written notice setting forth the nature of the default. In circumstances where 90 days' notice is unreasonable, the notice shall be given on the earliest date which is reasonably practicable. With respect to the first such

default only for which such a notice is given, the notice shall become ineffective to terminate this contract if the other party shall cure the default within 15 days after the date of service of the notice, as determined under Paragraph XXI hereof.

cy and neither a trustee nor a debtor in possession acquires any rights to otherwise alter the terms of the contract or to revive it. In short, contracts that have been effectively terminated prior to the filing of a chapter 11 petition cannot be revived by the bankruptcy court.

*Id.* at 334 (citations omitted). *See also In Re L J P, Inc.,* 22 B.R. 556, 558 (Bkrtcy.S.D. Fla.1982).

The present case is more complex than those discussed above because of the 90-day effective period for the dealership termination. However, similar principles have been found to be controlling. In *In Re Beck,* 5 B.R. 169 (Bkrtcy.D.Haw.1980) the debtor operated a beauty salon under a license from J.C. Penney Co. The contract specified that it could be terminated on 60 days notice. J.C. Penney gave notice, debtor then filed a chapter 11 petition before the 60 days had elapsed. The bankruptcy court ruled that the termination was effective. Under the terms of the agreement, nothing but the passage of time remained until the termination was complete. The court found no authority for the debtor in possession to extend that time, nor was the time tolled by 11 U.S.C. § 362.[4] In the present case, as in *Beck,* nothing remains to be done concerning the dealership termination. The fact that the 90 days had not passed as of the date of filing does not make the dealership contracts subject to extension beyond the 90-day period. If assumed during the period, the assumption would be for the remainder of the 90 days.

Where the remainder of the contract term is contingent on effecting a cure, 11 U.S.C. § 108(b)[5] must also be considered.

In *In Re Physique Forum Gym, Inc.,* 27 B.R. 691 (Bkrtcy.D.Md.1982) the debtor was in arrears on rent payments, and the lessor gave notice that if debtor failed to cure by September 24, 1982, the lease would be terminated effective September 30, 1982. Debtor failed to cure by September 24th, or at any time thereafter. Debtor filed on September 29, after time for cure had passed, but before the effective termination date. Judge Evans first acknowledged the right to cure executory contracts under 11 U.S.C. § 365(b), but then concluded that there was no right to cure, on the facts presented:

> The debtor's right to cure such default must, however, also be read in conjunction with 11 U.S.C. Section 108(b). Even if Section 108(b) is construed most favorably to the debtor, the debtor's right to cure its default was extended only until November 28, 1982, sixty days after the order for relief. Because the debtor did not cure the past arrearages, the Lease expired no later than November 28, 1982. Accordingly, with the termination of the Lease, there is no interest in the Lease to assume pursuant to 11 U.S.C. Section 365.

*Id.* at 693 (footnote omitted). On its facts *Physique Forum* is like *Beck,* in both cases, the time for cure had passed. The court's approach in *Physique Forum* was different however, in that it turned to § 108(b) and considered the possibility of curing default. Even under this expansive application, 11 U.S.C. § 108(b) is of no help to the present debtor on the dealership contracts since it did not cure within 60 days of filing.

Another case which considered the effect of tolling the time for termination under 11

---

**4.** The court acknowledged that it would have the power to enjoin termination "where permitting the termination will involve an extreme forfeiture or other gross inequity which provides' a compelling overriding need for the court to exercise its equitable powers." *Id.* at 171. The court concluded that such a case was not presented.

**5.** 11 U.S.C. § 108(b) states:
   (b) Except as provided in subsection (a) of this section, if applicable law, an order entered in a proceeding, or an agreement fixes a period within which the debtor or an indi-

vidual protected under section 1301 of this title may file any pleading, demand, notice, or proof of claim or loss, cure a default, or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of—
   (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; and
   (2) 60 days after the order for relief.

U.S.C. § 108(b) was *In Re Santa Fe Development & Mortgage Corp.,* 16 B.R. 165 (Bkrtcy.App. 9th Cir.1981). The debtor had an option to purchase land, and the right to extend the option for 30-day periods by making additional payments. Debtor made the payment on July 15, 1980, extending its option to August 16, 1980 and then filed a chapter 11 petition on August 5, 1980. The bankruptcy court held that the option expired on August 16, 1980. The appellate panel reversed. Judges Katz and Lasarow noted that 11 U.S.C. § 108(b) gave a trustee or debtor in possession a minimum of 60 days in which to file a demand or notice, cure a default or perform any other similar act. The court held that making a payment to extend the escrow was a "similar act," within the meaning of § 108(b). This aspect of *Santa Fe* is not particularly significant in the present case, since § 108(b) specifically allows curing a default, which is what the debtor is attempting to do. The reasoning in *Santa Fe* is significant because it holds that an executory contract with a post-petition termination date does not remain executory indefinitely, but only for the longer of the two periods set forth in § 108(b). In the present case, the jobbership contract which could have been cured on the date of filing, could only be cured during the 60 days after debtor filed. Since the default was not cured, the contract has terminated.

■ Recognizing the possibility that the court would find the contracts are not assumable under relevant bankruptcy law, the debtor has in the alternative petitioned the court for injunctive relief. The debtor has commenced an adversary proceeding against Amoco, alleging that Amoco's termination of the jobbership and dealership contracts violated the Petroleum Marketing Practices Act ("PMPA") 15 U.S.C. § 2801 *et seq.,* and the Wisconsin Fair Dealership Law ("WFDL"), Wis.Stat. § 135.01 *et seq.* A preliminary injunction was granted after hearing held on April 19, 1983. Debtor now seeks to permanently enjoin Amoco from taking any further steps to terminate the dealership and jobbership contracts.

The PMPA was enacted in an attempt to equalize the bargaining power of service station franchisees and their franchisors. *Lasko v. Consumers Petroleum of Connecticut Inc.,* 547 F.Supp. 211, 216 (D.Conn.1981). The Court of Appeals for the Seventh Circuit has noted that Congress was particularly concerned with termination or nonrenewal of franchises:

Congress designed the PMPA to allay three specific concerns: that franchisee independence may be undermined by the use of actual or threatened termination or nonrenewal to compel compliance with franchisor marketing policies; that gross disparity of bargaining power may result in franchise agreements that amount to contracts of adhesion; and that termination or nonrenewal may disrupt the reasonable expectations of the parties that the franchise relationship will be a continuing one.

*Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1216 (7th Cir.1982). *See also* Annot., 53 A.L.R. Fed. 348 (1981). Debtor's request for injunctive relief is made under 15 U.S.C. § 2805(b)(2), a provision of the PMPA which states:

... the court shall grant a preliminary injunction if—

(A) the franchisee shows—

(i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and

(ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

(B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

This standard allows relief on a lesser showing than that required by the case law under Fed.R.Civ.P. 65. In *Saad v. Shell Oil Co.,* 460 F.Supp. 114, 117 (E.D.Mich.1978) the court stated: "instead of a 'strong

showing' or 'probability' of success, the terms 'serious question' and 'fair ground for litigation' suggest merely a reasonable chance of success, something far less than the probability or likelihood required [in ordinary preliminary injunction cases]." *See also Wojciechowski v. Amoco Oil Co.,* 483 F.Supp. 109, 114 (E.D.Wis.1980).

There is no dispute that the first part of the test, termination of franchise, has been satisfied in the present case. For the second test the franchisor must come forward with evidence that the termination complied with the requirements of the PMPA. If the franchisor provides such evidence the burden then is shifted back to the franchisee to show that there are serious questions for litigation. *Lasko,* 547 F.Supp. at 221–22, *Escobar v. Mobil Oil Corp.,* 522 F.Supp. 593, 599–600 (D.Conn.1981), *vacated on other grounds,* 678 F.2d 398 (2d Cir. 1982). Amoco relies on 15 U.S.C. § 2802(b)(2)(A) which provides that: "a failure by the franchisee to comply with any provision of the franchise . . ." shall be grounds for termination. Amoco offers the N.S.F. checks and failure to cure along with the past due jobbership account as evidence of failure to comply with franchise agreements. Debtor contends that there was no "failure" as that term is used in PMPA. Pursuant to 15 U.S.C. § 2801(13) the term "failure" does not include:

(A) any failure which is only technical or unimportant to the franchise relationship; or

(B) any failure for a cause beyond the reasonable control of the franchisee.

The Mauston and Oakdale dealership contracts were terminated because the debtor failed to cure the N.S.F. checks within 5 days, as is required in paragraph 5(b) of both contracts. The bank's dishonor of debtor's checks was allegedly wrongful, and may arguably have been beyond the reasonable control of the debtor at least as to its timing. Debtor has not however, explained why he failed to cure. Although it was suggested that debtor's finances were in a confused state following the bank's setoff and dishonor and during the discussions

with Amoco, debtor admitted on cross-examination that no one told him he did not have to cure. Amoco presented evidence that during the 5-day period for cure, debtor opened a checking account at the First Bank of Tomah and maintained an average daily balance of approximately $46,000.00. The total amount needed to cure N.S.F. checks written to Amoco was approximately $20,000.00. There is no basis on which to conclude that the failure to cure within the 5-day period was beyond the reasonable control of the debtor.

Debtor also argues that writing N.S.F. checks in the amount of $20,000.00 was "technical or unimportant to the franchise relationship," considering the debtor's 24 year history of timely payments on its dealership contracts. No cases have been located which apply this specific language of the PMPA. Prompt payment for goods delivered would, however, appear to be at the heart of the franchise relationship. Amoco's witness testified that prompt payment was considered important. That the debtor had not defaulted in the past may well suggest that it too considered timely payment important. Thus, applying the relaxed standard for injunctive relief under PMPA, debtor has failed to show there is a serious question which is fair grounds for litigation concerning termination of the dealership contracts.

Turning to the jobbership contract, debtor argues that there was no "failure" within the meaning of PMPA because the arrearages were beyond the reasonable control of the debtor. Specifically, debtor contends that the arrearages were the result of Amoco's unilateral changes in credit policies. For example in September of 1981, Amoco reduced the time in which accounts were due from 30 days to 15 days. A substantial amount of debtor's account became past due with Amoco's change in policy. This change affected the debtor more than most jobbers because other jobbers took advantage of Amoco's 1 percent discount for payment within 10 days. Amoco also discontinued a freight allowance of 2 cents per gallon hauled, which had been

profitable for the debtor. A representative of Amoco testified that these were nationwide policy changes applicable to all of Amoco's jobbers. The PMPA specifically permits termination or nonrenewal where the franchisor and franchisee cannot agree to changes in the franchise agreement, if:

> (i) such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and
>
> (ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of preventing · the renewal of the franchise relationship.

15 U.S.C. § 2802(b)(3)(A). In *Pearman v. Texaco, Inc.,* 480 F.Supp. 767, 771 (W.D.Mo. 1979) the court found no serious question for litigation where:

> there is no indication that plaintiff was treated any differently than any other franchisee when Texaco sought to make changes in plaintiff's lease.... The Lease offered plaintiff was the same form lease submitted to every other dealer.

*Id.* at 771. Because PMPA authorizes nondiscriminatory changes in franchisor's business practices, it would not be reasonable to conclude that these changes would be included as factors beyond the reasonable control of the franchisor.

Debtor further contends that the $213,-000.00 arrearage was "technical or unimportant to the franchise relationship," because Amoco had knowledge of the arrearage since 1981, and had taken no action. The evidence however, showed that Amoco monitored the debtor's jobbership account from the time it became past due in 1981 and encouraged debtor to bring the account current as it could. Additionally, Amoco acted to terminate the jobbership in August of 1982 and granted an extension only on debtor's representations that it would provide additional security. Even if Amoco had taken no action, acquiescence would not excuse debtor's breach. *See Escobar,* 522 F.Supp. at 601.

■ Debtor's final argument concerning the jobbership contract is that under PMPA, a franchisor cannot terminate for a failure to comply with a franchise agreement where the franchisor has knowledge of the failure for more than 120 days before giving notice. 15 U.S.C. § 2802(b)(2)(A)(i). Amoco did have knowledge of debtor's failure to pay for more than 120 days before giving notice in August of 1982 or February of 1983. However, in *Day Enterprises, Inc. v. Crown Central Petroleum,* 529 F.Supp. 1291 (D.Md.1982) the court considered the legislative history of the section and concluded: "a new period begins to run with each new violation of the franchise agreement even if the new violation is a 'repeat occurrence' of a violation with respect to which a previous right of termination was waived." *Id.* at 1299. Since the contract violations continued up to the time notice was sent, there is no serious question for litigation arising out of debtor's assertion that Amoco had knowledge of the contract violation more than 120 days before sending notice.

Having concluded that the debtor has shown no serious question for litigation under the PMPA, injunctive relief must be denied. The relative hardships caused by granting or denying relief need not be considered.

■ Debtor's complaint also alleges that policy changes by Amoco are in violation of the Wisconsin Fair Dealership Law (WFDL) Wis.Stat. § 135.01 *et seq.* Debtor asks the court to enjoin Amoco from implementing those policy changes. The WFDL is preempted by the PMPA to the extent that it applies to termination or nonrenewal of any franchise. *See* 15 U.S.C. § 2806, *Lasko,* 547 F.Supp. at 216–18. Debtor's complaint alleges that Amoco made changes in the ongoing franchise relationship, therefore application of the WFDL is not entirely preempted.

■ Before granting injunctive relief under the WFDL this court must find that: (1) plaintiff has no adequate remedy at law and will be irreparably harmed if the injunction does not issue; (2) plaintiff has at least a reasonable likelihood of success on

the merits; (3) the threatened injury to the plaintiff outweighs. the threatened harm the injunction may inflict on the defendant; (4) the injunction will not disserve the public interest. *See Milwaukee Rentals Inc. v. Budget Rent A Car Corp.,* 496 F.Supp. 253, 254 (E.D.Wis.1980). The WFDL provides that an alleged violation of the act shall be deemed irreparable injury to a dealership for purposes of a temporary injunction, Wis.Stat. § 135.065. Thus we may turn to the debtor's likelihood of success on the merits.

Debtor relies on Wis.Stat. § 135.03, which provides:

> No grantor, directly or through any officer, agent or employee, may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause. The burden of proving good cause is on the grantor.

The change in competitive circumstances concerning the jobbership which debtor alleges violated the WFDL include: Amoco's change in credit terms on September 1, 1981, elimination of the transportation allowance for jobbers, and policy of selling comparable products to retailers at a lower price than to jobbers. Concerning the dealership contracts, debtor alleges that Amoco's "Cents off for Cash" program and Amoco's gasoline pricing policy were in violation of the WFDL. The evidence presented concerning all of these changes was minimal, but the evidence showed that these changes were adopted on a nationwide basis and applied to all jobbership and dealership contracts. Debtor also alleges that by placing the jobbership on a C.O.D. basis in October of 1982 Amoco violated the WFDL. Unlike those changes described above, this change was directed solely to the debtor's jobbership.

In *Van v. Mobil Oil Corp.,* 515 F.Supp. 487 (E.D.Wis.1981) Judge Warren considered what kinds of change in "competitive circumstances" were barred by the WFDL. In that case Mobil changed the plaintiff from a "previous load basis" (PLB) to a C.O.D. basis and the dealer sued under the WFDL. Mobil's motion for summary judgment was denied, the court finding that Mobil was not entitled to judgment as a matter of law:

> At the outset, the Court rejects defendant's contention that, as a matter of law, the change in credit terms did not constitute a change in plaintiff's competitive circumstances. Although the change may have amounted to nothing more than the adoption of a prudent business practice to defendant, to plaintiff it constituted a barrier which had to be overcome before he could continue operating his franchise.
>
> A mere change in competitive circumstances does not, of course, bring the Wisconsin Fair Dealership Law into play, for the change must constitute a substantial change in competitive circumstances. Case law is slim as to what changes constitute substantial changes. In fact, the parties have pointed to only one case in which the issue was directly confronted. In *Madison Truck Plaza, Inc., et al. v. Union Oil Company of California,* Case No. 519–821 (Milwaukee County Circuit Court, June 2, 1980), Judge Gram held that the imposition by defendant on plaintiff dealers of a 2.5 percent charge on certain credit transactions did not substantially change the competitive circumstances of the dealership agreement....
>
> The case at bar differs vastly from the case Judge Gram decided. The change in the instant case affected only one dealer rather than all dealers in similarly situated positions as in *Union Oil.* Consequently, unlike the plaintiffs in *Union Oil,* defendant's competitive position vis-a-vis other dealers was affected on both the intra-company level and the inter-company level. Furthermore, in *Union Oil* the change affected only credit sales, whereas here plaintiff's ability to obtain *any* gasoline from defendant was affected. Finally, there was no indication in *Union Oil* that the change would affect the plaintiff's abilities to continue in business, whereas in the present action defendant was well aware of plaintiff's precarious financial condition and may have known

**224**

that the change in credit terms could affect his ability to stay in business. The nature of plaintiff's business financial condition at the time of the credit change; defendant's knowledge of that condition; the wide-reaching impact the change had on plaintiff's ability to even do business with defendant; and the actual effect of the change lead the Court to reject defendant's contention that the change from PLB credit basis to C.O.D. status did not constitute a substantial change in plaintiff's competitive circumstances.

*Id.* at 490–91. Based upon the reasoning in *Van* and *Union Oil,* it must be concluded that Amoco's nationwide policy changes imposed upon all dealers and jobbers are not changes in competitive circumstances within the meaning of Wis.Stat. § 135.05. Thus, debtor has failed to show that it has a reasonable likelihood of success on those claims. However debtor's claim that placing the jobbership account on a C.O.D. basis in October of 1982 was a change in competitive circumstances is similar to the situation presented in *Van.* In both cases, the franchisors changed the credit terms of individual dealers based upon the dealer's financial difficulties. Debtor therefore may have shown that it has a reasonable likelihood of success on the merits on that issue only.

The third element of the test for injunctive relief requires the court to find that the threatened injury to the plaintiff outweighs the threatened injury to the defendant caused by the injunction. In the present case it has already been determined that there is no basis on which to enjoin Amoco from proceeding with termination of the dealership and jobbership agreements. As noted above, only the PMPA is applicable to termination of those agreements. Since Amoco has the right to terminate the jobbership, enjoining enforcement of Amoco's C.O.D. policy would neither help debtor nor harm Amoco and would probably be meaningless. Therefore, debtor's request for injunctive relief based on alleged violation of the WFDL must be denied.